Filed 6/30/14; pub. order 7/25/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITIZENS OPPOSING A DANGEROUS ENVIRONMENT, | F067567 |
| Plaintiff and Appellant, | (Super. Ct. No. CV-275009) |
| v. | |
| COUNTY OF KERN et al., | **OPINION** |
| Defendants and Respondents; | |
| NORTH SKY RIVER ENERGY, LLC et al., | |
| Real Parties in Interest and Respondents; | |
| JAWBONE WIND ENERGY, LLC et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Kern County.  William D. Palmer, Judge.

Leibold McClendon & Mann and John G. McClendon for Plaintiff and Appellant.

Theresa A. Goldner, County Counsel, and Charles F. Collins, Deputy County Counsel, for Defendants and Respondents.

SSL Law Firm, Zachary R. Walton, Christine R. Wade, Elizabeth L. Bridges, and Corinne I. Calfee; Drinker Biddle & Reath, George T. Caplan and Kristopher S. Davis for Real Parties in Interest and Respondents North Sky River Energy, LLC and North Sky River Land Holdings, LLC.

Law Offices of Philip Rudnick and Philip R. Rudnick for Real Parties in Interest and Respondents Jawbone Wind Energy, LLC and Philip Rudnick.

-ooOoo-

This is an appeal from an order of the Superior Court of Kern County denying a petition for a writ of mandamus in favor of respondents County of Kern (the County) and Kern County Board of Supervisors (the Board).

Real parties in interest North Sky River Energy, LLC (North Sky River), and Jawbone Wind Energy, LLC (Jawbone),[1] applied for rezoning and a conditional use permit for mobile concrete batch plants in order to build and operate a wind farm in the Tehachapi Wind Resource Area. Pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[2] and its Guidelines,[3] the County conducted an initial study, determined that the project might impose a significant impact on the environment, and prepared a draft environmental impact report (EIR). The draft EIR, inter alia, indicated that the project's wind turbine generators (WTG's) might pose a

---

[1] North Sky River Land Holdings, LLC, and Philip Rudnick, Jawbone's owner and counsel, have also been identified as real parties in interest.

[2] Unless otherwise indicated, subsequent statutory citations refer to the Public Resources Code.

[3] The Guidelines refer to California Code of Regulations, title 14, section 15000 et seq. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 (*Laurel Heights I*).) They are authorized by CEQA (§ 21083) and accorded great weight in interpreting the statute except where they are clearly unauthorized or erroneous (*Sunset Sky Ranch Pilots Assn. v. County of Sacramento* (2009) 47 Cal.4th 902, 907, fn. 3).

2.

significant safety hazard to aircraft and gliders using Kelso Valley Airport (KVA), and described Mitigation Measure 4.8-8 (MM 4.8-8) which required North Sky River and Jawbone to obtain a "Determination of No Hazard to Air Navigation" from the Federal Aviation Administration (FAA) for each WTG prior to issuance of building permits. After the County circulated the draft EIR for public review and prepared a final EIR responding to comments, the Board concluded that MM 4.8-8 minimized the WTG's potential adverse effects on aviation safety, certified the final EIR, and approved North Sky River and Jawbone's rezoning and conditional use permit requests.

On October 19, 2011, appellant Citizens Opposing A Dangerous Environment (CODE)[4] timely petitioned for a writ of mandamus to set aside EIR certification and project approval on the grounds that MM 4.8-8 was ineffective and respondents failed to comply with CEQA's requirements.[5]  The superior court tentatively denied the petition on February 19, 2013, affirmed its ruling on April 9, 2013, and signed its order on May 20, 2013.  Respondents served and filed a notice of entry of the court's order on May 30, 2013, and CODE filed a notice of appeal on June 18, 2013.[6]

---

[4]      Philippe Athuil, owner of KVA, is a member of CODE.

[5]      CODE's petition for a writ of administrative mandamus will be reviewed as one for a writ of traditional mandamus under section 21168.5 because the challenged agency decision is legislative in character.  (See, e.g., *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165; *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885.)  The distinction between traditional mandamus and administrative mandamus is relevant in this case because "the rules regarding the admission of extra-record evidence in a CEQA matter involving ordinary mandamus are judicially made, and the foundation for those rules was established by the California Supreme Court in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 (*Western States*)."  (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 61, fn. 4.)

[6]      The respondents' brief, which was filed by respondents and North Sky River and later joined by Jawbone, states that North Sky River completed its portion of the wind farm in 2012, but Jawbone has yet to obtain any building permits.

On appeal, CODE presents the following issues:

"[(1)] Whether federal aviation law preempted the County from identifying and imposing feasible alternatives and/or mitigation measures on the Project to *avoid* or *eliminate* the Project's admitted potentially hazardous impacts on KVA; [¶] … [¶]

"[(2)] Whether the County's responses to CODE's comments on the EIR and the Project complied with CEQA and the Guidelines;

"[(3)] Whether substantial evidence in the [administrative record] supports the County's finding that MM 4.8-8 reduces the Project's admitted potentially hazardous aviation impacts on KVA to a level of insignificance;[7]

"[(4)] Whether the County improperly rejected CODE's proffered feasible alternatives and mitigation measures to eliminate the Project's admitted potential impact on aviation at KVA; and

"[(5)] Whether substantial evidence in the [administrative record] supports the County's rejection of the EIR's environmentally superior alternative."

In a related matter, Jawbone moves to be dismissed from this appeal, citing our "inherent power." We deny the motion: Jawbone was named as a recipient of approval in the Board's notice of determination and is therefore a real party in interest that should be included in the litigation pursuant to section 21167.6.5, subdivision (a). (Cf. *Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 848.)

[7] CODE identifies as separate issues "[w]hether CEQA permitted the County to ignore evidence that [North Sky River] had carried out MM 4.[8]-8 in a fraudulent manner" and "[w]hether CEQA permitted the County to approve the Project despite being presented with evidence that MM 4.8-8 had *already* failed in its purpose to mitigate the Project's admitted potentially hazardous aviation impacts on KVA." These issues relate to MM 4.8-8's efficacy or lack thereof. "[W]hether the proposed mitigation measure[] will really work … is not the appropriate question." (*National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1366.) Instead, the proper inquiry is whether the public agency "ha[d] a sufficient basis in expert opinion and other evidence to conclude that the potential impact[] of the project … had been mitigated to a level of insignificance[.]" (*Ibid.*) Therefore, any arguments relating to MM 4.8-8's efficacy shall be addressed within the framework of the substantial evidence standard.

4.

We conclude: (1) as a matter of law, the County's EIR described a legally feasible mitigation measure; (2) as a matter of law, the County was not required to respond to late comments; (3) substantial evidence supported the Board's conclusion that MM 4.8-8 mitigated significant impacts on aviation safety; and (4) the Board was not required to consider either CODE's proffered mitigation measure or the EIR's "environmentally superior alternative." Therefore, we affirm the superior court's order denying CODE's petition for a writ of mandamus.

# FACTUAL HISTORY[8]

North Sky River and Jawbone proposed the construction and operation of a 339-megawatt wind farm, consisting of 116 WTG's, ancillary facilities, and supporting

**8** The appellate record consists of appellant's appendix, in lieu of the clerk's transcript (see § 21167.6, subd. (g), citing Cal. Rules of Court, rule 8.124), administrative record excerpts, and a joint appendix of administrative record excerpts (see Cal. Rules of Court, rule 3.1365(c)). In their respective briefs, the parties cite material that cannot be found in this record. "Factual matters that are not part of the appellate record will not be considered on appeal and such matters should not be referred to in the briefs." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 102; see *Princess Cruise Lines, Ltd. v. Superior Court* (2009) 179 Cal.App.4th 36, 45 ["Statements of facts not supported by references to the record may be disregarded as a violation of rule 8.204(a)(1)(C) of the California Rules of Court."].)

CODE asks us to judicially notice 108 documents from the FAA's "Circle Search for Airports" online database, which display public-use airports located within a 20-nautical-mile radius of each of the project's WTG's. We deny the request. First, CODE has not shown that the search results were part of the administrative record under section 21167.6, subdivision (e), and excluded from the record certified by the County. Second, CODE has not shown that the search results were admissible as relevant, extra-record evidence on grounds either recognized or left open by the Supreme Court in *Western States*, *supra*, 9 Cal.4th 559. (See *Madera Oversight Coalition, Inc. v. County of Madera*, *supra*, 199 Cal.App.4th at p. 62 ["Specifically, there are two distinct ways to place evidence before the superior court in a CEQA matter: [t]he evidence can be (1) included in the *administrative record* … or (2) admitted as *extra-record evidence*."].)

North Sky River asks us to judicially notice FAA Order JO 7400.2H, "Procedures for Handling Airspace Matters" (Mar. 10, 2011), which "specifies procedures for use by all personnel in the joint administration of the airspace program" and was effective for the period of March 10, 2011, to February 8, 2012. (<http://www.faa.gov/regulations_policies/orders_notices/index.cfm/go/document.information/documentID/928963/Basic7400.2H.pdf> [as of May 29, 2014] (FAA Order JO 7400.2H).) We grant this request because FAA Order JO 7400.2H was referenced in documentation prepared for and presented to the Board. (Cf. *Porterville Citizens for Responsible Hillside Development v. City of Porterville*, *supra*, 157 Cal.App.4th at p. 890; see *Western States*, *supra*, 9 Cal.4th at p. 573, fn. 4.)

infrastructure, on a 13,535-acre site in the Tehachapi Wind Resource Area.[9]  They requested the rezoning of 2,442 acres from exclusive agriculture districts to wind energy combining districts and a conditional use permit for mobile concrete batch plants.[10]  The County conducted an initial study, determined the project might impose a significant environmental impact, prepared a draft EIR, and circulated the document for public review from May 6, 2011, to June 20, 2011.  The comment period closed June 20, 2011.

The draft EIR enumerated the following project objectives:

"[North Sky River's] objectives for the project are to:

"1.     Make a significant contribution toward achieving the California Renewable Portfolio Standard … goal that 33 percent of electricity be generated by renewable energy by 2020;

"2.     Maximize energy production and economic viability by locating the project in an area with optimal wind and solar resources and terrain characteristics;

"3.     Optimize the use of underused and undeveloped land within the Tehachapi Wind Resource[] Area;

"4.     Increase local short-term and long-term employment opportunities;

"5.     Reduce greenhouse gas emissions by providing a long-term alternative means of energy to conventional fossil fuels;

"6.     Use state-of-the-art WTG technology to achieve increased performance, lower cost, higher reliability, and longer service life; and

---

**9**     The project site is located south and east of the Kelso Valley Road and Jawbone Canyon Road intersection, approximately six miles east of Twin Oaks, eight miles west of Cantil, and 13 miles north of the State Route 58 and State Route 14 interchange.

**10**     North Sky River and Jawbone submitted separate applications for their respective projects.  Because the proposed projects were located on adjacent parcels, they were treated as a single project by the County.

"7.    Produce electricity without the need for large amounts of water in relation to conventional means (approximately 1/600 as much water per unit of electricity produced compared with nuclear and approximately 1/500 as much as coal).

"[Jawbone's] objectives for the project are to:

"1.    Provide an approximately 39-[megawatt] project generating approximately 100,000 [megawatt hours] per year of electricity, in California, through optimization of renewable energy sources;

"2.    Supply renewable energy that will help the State of California meet its goals by reducing reliance on energy generated from fossil fuels;

"3.    Provide property tax revenues to [the] County;

"4.    Assist [the] County in promoting its role as the State's leading renewable energy producer;

"5.    Provide green jobs to [the] County and the State of California;

"6.    Realize the full potential of the wind resource;

"7.    Result in an economically feasible renewable energy project that would be developed through commercially available financing;

"8.    Supply clean, safe, renewable energy for approximately 9,000 homes; and

"9.    Support California's goal of 33 percent renewable energy generation by 2020."

Concerning the project's potential adverse effects on aviation safety and the mitigation of these effects, the draft EIR detailed:

"**Impact 4.8-4:  For a Project Within the Vicinity of a Private Airstrip, Would the Project Result in a Safety Hazard for People Residing or Working in the Project Area**[?]

"The project could pose a navigation hazard to private aircraft and high performance gliders using nearby private airstrips due to the height of the WTG structures (maximum height of 500 feet above ground surface).  The proposed project is located near one

8.

unpermitted private airstrip [KVA], which is located 1.2 miles northwest or west of the project site boundary.  MM 4.8-8 would ensure that the proposed project complies with all FAA regulations regarding structures located within proximity to airstrips.

"**Mitigation Measures**[:]  [¶]  Implement [MM] 4.8-8.

"**Level of Significance after Mitigation**[:]  [¶]  Impacts would be less than significant."

"**MM 4.8-8**[:]  Prior to issuance of building permits, the project proponents shall submit Form 7460-1 (Noti[ce] of Proposed Construction or Alteration) to the [FAA], in the form and manner prescribed in 14 Code of Federal Regulation[s] [part 77.7].  The project proponents shall also provide documentation to the [County's] Planning and Community Development Department demonstrating that the [FAA] has issued a 'Determination of No Hazard to Air Navigation.'  This documentation shall include:  (1) written concurrence from the military authority responsible for operations in the flight area depicted in [the County's] Zoning Ordinance Figure 19.08.160 that all project components would create no significant military mission impacts; (2) a wind turbine generator lighting plan; and (3) a helicopter lift plan demonstrating compliance with all requirements set forth by the [FAA] and [the] County.  Documentation shall also be furnished to the [County's] Planning and Community Development Department demonstrating that a copy of the approved form(s) has been provided to the operators of [KVA], California City Municipal Airport, Tehachapi Municipal Airport, Edwards Air Force Base, China Lake Naval Air Weapons Station, and Fort Irwin/National Training Center."

"The FAA regulates aviation at regional, public, private, and military airports ….  The FAA regulates objects affecting navigable airspace and structures taller than 200 feet according to … [14 Code of Federal Regulations part 77.9].  The U.S. and California Departments of Transportation also require the proponent to submit FAA Form 7460-1, Notice of Proposed Construction or Alteration.  According to [14 Code of Federal Regulations part 77.5], notification allows the FAA to identify

potential aeronautical hazards in advance, thus preventing or minimizing any adverse impacts on the safe and efficient use of navigable airspace….

"As described in [14 Code of Federal Regulations part 77.9] (Construction or alteration requiring notice), each sponsor who proposes any of the following construction or alteration scenarios shall notify the FAA in the form and manner prescribed in [14 Code of Federal Regulations part 77.7]: [¶] (1) Any construction or alteration of more than 200 feet in height above the ground level at its site. [¶] … [¶]

"Per [14 Code of Federal Regulations part 77.7], notification requirements include sending one executed form set (four copies) of FAA Form 7460-1, Notice of Proposed Construction or Alteration, to the Manager, Air Traffic Division, FAA Regional Office having jurisdiction over the area within which the construction or alteration will be located. The notice required must be submitted at least [45] days before the earlier of the following dates: (1) the date the proposed construction or alteration is to begin or (2) the date an application for a construction permit is to be filed."[11]

The draft EIR also described three alternatives.[12] "Alternative A: No Project" precluded construction and maintained the environmental status quo for the foreseeable future. "Alternative B: Relocate to San Gorgonio Wind Resource[] Area" moved the project to a comparable site in Riverside County. Lastly, "Alternative C: Reduced Project Size" eliminated up to 23 WTG's in areas of high biological and cultural resource sensitivity. The draft EIR concluded:

---

[11] At oral argument, North Sky River's counsel explained the process of obtaining no-hazard determinations in three stages. First, a conceptual site plan was submitted to the FAA to identify potential aeronautical hazards in advance of construction. Second, the FAA issued "preliminary" no-hazard determinations, which led to approval of the building permits. Third, after the WTG's were constructed, the FAA evaluated the actual structures to corroborate its previous findings and issued "final" no-hazard determinations.

[12] The County eliminated three other alternatives from consideration because they either failed to satisfy the project's objectives or were infeasible: (1) relocation to the Altamont Pass Wind Resource Area in Alameda County; (2) construction of a solar photovoltaic facility; and (3) reduction of the project's construction rate.

10.

"Alternative A, the No Project Alternative, would be environmentally superior to the project on the basis of the minimization or avoidance of physical environmental impacts. Section 15126.6(e)(2) of the … Guidelines states that if the no project alternative is found to be environmentally superior, 'the EIR shall also identify an environmentally superior alternative among the other alternatives.'

"Due to the reduction of impacts to aesthetics, biological resources, and cultural resources achieved by Alternative C (Reduced Project Size), it is considered the environmentally superior alternative. Alternative C reduces the significant and unavoidable impacts of the proposed project … and has less severe significant impacts as compared to Alternative B…."

"Alternative C would achieve some of the project proponents['] objectives. Because the alternative would reduce the project by up to 23 WTG[']s, it would reduce the contribution towards achieving the California [Renewable Portfolio Standard] goal … and would subsequently reduce the benefit renewable energy offers to greenhouse gas emissions …."

KVA, a private airport owned by Dr. Philippe Athuil (*ante*, fn. 4), is located on a 296-acre plot adjacent to the Tehachapi Wind Resource Area,[13] about 1.2 miles from the project site. One of Athuil's attorneys, Dale J. Goldsmith, sent the following letter dated June 20, 2011, to the County:

"… Dr. Athuil is very concerned that the construction and operation of the Project as proposed will present severe safety risks to the glider pilots who use [KVA]. The Project proposes to erect a number of up to 500-foot-tall [WTG's] in the glide path of the gliders. A collision between a glider and a WTG could maim or kill the pilot. The Project can and should be modified to eliminate this safety hazard to allow [KVA] and the Project to coexist. [¶] … [¶]

"… [E]xisting terrain limits the number of feasible ingress and egress routes to and from [KVA]. The proposed WTG's would block or severely limit the use of two of the three primary approach routes, leaving only one practical air route to and from [KVA]. Moreover, the proposed

---

**13** KVA consists of a set of runways in the southwestern part of the property and a second set in the northeastern part. Otherwise, the land is "rural," "sparsely developed," and primarily zoned for exclusive agriculture and recreational forestry.

11.

WTG sites are densely clustered and positioned on ridges that normally provide additional lift for gliders attempting to return to the airport. Unpowered aircraft such as gliders have extremely shallow descent ratios, ranging from 50-100 to 1 without the use of spoilers or other lift reducing equipment techniques. Increasing the height of the obstruction field with WTG[']s and eliminating a pilot's ability to safely use the ridgeline will change the pilot's transit strategy and substantially decrease margins of safety for landing at [KVA]. This could result in tragic consequences. [¶] … [¶]

"The [draft EIR] does not consider the Project's land use compatibility with adjoining land uses, including [KVA]. As discussed above, the WTG[']s along the nearby ridgeline will severely impact current glider operations at [KVA] and create significant safety hazards. It also will likely preclude future commercial use of [KVA]. The [draft EIR] should be revised to include this analysis, disclose adverse impacts, and require mitigation measures, such as relocating the WTG[']s from the ridgelines, to reduce the impacts to less than significan[t]."[14]

In July 2011, the County published the final EIR, which contained the following response to Goldsmith's June 20, 2011, letter:

"… [KVA] was considered in the analysis and the implementation of [MM 4.8-8] …. [¶] … [¶] … MM 4.8-8 would require that the project proponent file a form 7460-1, Noti[ce] of Proposed Construction or Alteration, with the FAA for each WTG, met[eorological evaluation] tower, transmission line tower and construction crane meeting the FAA 7460 requirements for a determination of no hazard to air navigation. If the FAA determines that the project would result in a potential obstruction unless reduced to a specified height, the project proponents would be required to work with the FAA to resolve any adverse effects on aeronautical operations. This mitigation measure would ensure less than significant impacts to existing aviation facilities and airspace use. The [FAA] makes the final determination on safety issues related to flight hazard."

Howard Weinberg, another of Athuil's attorneys, provided the County with a report by William P. Long dated August 10, 2011. In his report, Long detailed:

---

**14** Goldsmith also challenged the draft EIR's description of KVA as "unpermitted" and, in the alternative, asserted that Athuil could still operate KVA "as a legal, nonconforming use" in the absence of the proper land use permits.

"As an Aviation Services Professional, my career includes experience in aircraft ground services, air traffic control, airspace management, airport operations management, aviation system development and as a Senior Aviation Consultant and former [FAA] Airport Certification/Safety Inspector.  I possess a rich and uniquely diverse foundation of ensuring airport environments that support and encourage safe and practical aircraft operations which in turn enhances the safety of communities enhanced and/or impacted by aviation.…   [¶] … [¶]

"It is my understanding that two separate FAA Form 7460-1 applications were made by the Project proponents with regard to proposed construction of WTG['s]….  [Athuil] and his representatives have never been contacted by the FAA, have never been invited to submit comments to the safety analysis performed by the FAA, and have never received copies of the determinations allegedly issued by the FAA.  All of this is a direct violation of the formal process, procedures and protocol required by the operating rules and policies of the FAA.  [¶] … [¶]  … There is little credibility to any FAA safety study conducted based solely upon the FAA Form 7460-1 submitted by the Project applicants.  The only legitimate safety review must be conducted as part of a public process, including comments by the stakeholders who will be the direct beneficiaries of a proper safety study, and who, without a proper[] safety study, will be the injured parties colliding with dangerously placed WTG[']s."

On August 11, 2011, the County's Planning Commission conducted a public hearing and recommended EIR certification and project approval.

On or after August 29, 2011, Zachary Walton, counsel for North Sky River, provided the County with an airspace and obstacle evaluation study by Ron Morgan of JDA Aviation Technology Solutions.  In this study, Morgan disputed Long's August 10, 2011, report:

"… [KVA] is a private-use airport and not subject to the same protections afforded to airports that serve the public.  That being said, the FAA has means to mitigate turbine development in close proximity to airport finals and has done so at many airports around the country….

"Analysis conducted by the FAA shows that there is no airspace compatibility issue to [KVA] as a result of [North Sky River's share of WTG's].  All 102 turbines have been issued Determinations of No Hazard.

13.

Very few airports in the United States, either private or public, have an obstruction free (ground up) surface around the airport. [¶] … [¶]

"Mr. Long's finding that no valid conclusions of airspace safety could be concluded are … based upon the assumption that A) not all FAA offices were consulted in the [Obstruction Evaluation] process and B) that comments were not solicited from the airport owner. JDA contacted the FAA specialist who handled these cases and found that all offices either responded to the case or were auto-screened. In the development of the [Obstruction Evaluation/Airport Airspace Analysis] automation system, the FAA developed criteria for the assessment of aeronautical studies by the disparate lines of business. Certain offices opted to allow for automated review of certain cases based upon the location and height of the planned obstacle. The Office of Airports, for example, auto-screens all cases with planned structures that are greater than 3 nautical miles from a public-use airport reference point. However, the office with responsibility for assessing impact on [Visual Flight Rule] operations did review the case and found that the planned structures would have no adverse impact on [Visual Flight Rule] operations.

"FAA Order 7400.2H paragraph 6-3-17(a)(1) states that 'Normally, any structure that would exceed obstruction standards, affect an airport, have possible [Visual Flight Rule] effect, and/or require a change in aeronautical operations or procedures should always be circularized.' The planned turbines do not exceed the obstruction standards specified in 14 [Code of Federal Regulations] Part 77. The planned turbines were found to have no impact on a public use airport and have no possible [Visual Flight Rule] effect. No aeronautical operations or procedures would be changed as a result of the planned turbines. Therefore, it was not necessary to circularize the cases. However, had the cases been circularized and had [KVA's] owner objected to the planned turbines based on perceived impacts to [KVA], the FAA would likely have found that neither the standards for adverse effect nor substantial adverse effect would have been met. This would have resulted in the issuance of determinations of no hazard for all 102 cases reviewed."

In a letter to the Board dated September 12, 2011, Weinberg remarked:

"We have repeatedly asked for aviation safety studies to be performed, but the County has refused. We are now informed that [North Sky River] has had the FAA conduct some sort of 'automated' or desktop review of the aviation risks posed by [North Sky River's portion of the

14.

project].  As discussed below, these FAA Determinations (which have not been provided to us or to the public) are inaccurate and inadequate.

"Our client, at some considerable expense, has had an aviation expert develop[] a map of the Project['s] area[] and the areas of intersection between the proposed WTG[']s and the flight paths of aircraft to and from [KVA]….  One can, with no engineering or surveying expertise, immediately determine from the [m]ap[] that the proposed WTG locations will result in an unavoidable safety problem for aircraft using [KVA].  In fact, if the Project[] [is] approved and constructed, it would be so dangerous to fly near the WTG[']s that it is likely [KVA] would become unusable.  As the [m]ap[] make[s] clear, the Project[] cannot be approved until a detailed and proper aviation safety study is conducted and then the County can consider the aviation safety impacts of the Project.[15]  [¶] … [¶]

"The Project cannot be now approved, because there is no required mitigation at all.  In the case of [KVA], the FAA has no authority to require the relocation of the WTG[']s, the change in their size or orientation - in fact, the FAA has no authority whatsoever regarding the construction of the proposed Project.  All that the FAA can do is study the WTG[']s to be constructed and then determine the nature and extent of the aviation safety risk that will be created by such construction.  Simply requiring the project applicant, at some time in the future, to obtain a Determination of No Aviation Risk prior to the issuance of a building permit is not [a] well[-]defined or adequate mitigation measure.  Also, the County has failed to identify and consider all feasible mitigation measures.  One example of a feasible mitigation measure is to relocate or eliminate all of the WTG[']s in the flight paths of aircraft using [KVA] (i.e. the WTG[']s shown on the [m]ap as interfering with aviation flight paths).  This one mitigation measure alone is both feasible and necessary.  [¶] … [¶]

"[Morgan's letter] states that [North Sky River] has obtained 102 Determinations of No Hazard from the FAA….  As you know from our previous Comment Letters, the owner of [KVA] has never been contacted by the FAA or [North Sky River] and has never given input into any FAA safety determination, nor has Dr. Athuil (or this firm) ever received a copy of the FAA Determinations.  [¶]  … To date, the applicants for the Project have spent a considerable amount of time and legal maneuvering to avoid disclosure of their interaction with the FAA and the results of the FAA review.  Even now, neither the County nor the public has reviewed the

---

**15**    This map is included in the appellate record.

FAA Determinations. We believe that when a proper and fully public aviation safety study is completed, it will show the dire and unmitigated aviation safety impacts that would be created if the Project[] [was] constructed. [¶] … [¶]

"… [I]f the FAA Determinations were issued, they have been issued in violation of numerous applicable codes and regulations. Dr. Athuil has never been contacted by the FAA in connection with any such Determination, no member of the FAA has ever visited [KVA] to consider the physical layout of the airport and its orientation and proximity to the proposed WTG[']s, no[r] has any hearing been held to consider this determination. These facts were confirmed by [Morgan's letter] that explained the FAA Determinations were 'auto-screened;' technical jargon for the FAA analyzing hazards based only upon the data presented to them by [North Sky River], without any confirmation that the data in fact comports with conditions on the ground - and without contacting [KVA]…. [¶] … To our knowledge, the only way that the FAA could have analyzed the aviation safety impacts of the WTG[']s would have been to use the old data in their database - that showed the old runway configurations for [KVA]. Of course, if the FAA did use these old runways as the basis of the FAA Determinations, they would have made significantly different conclusions about safety, because the old runway configurations did not have the direct flight path impacts into the WTG[']s that exist now for the current runway configurations." (Original fns. omitted.)

In a report to the Board dated September 13, 2011, the County's staff responded to Weinberg's September 12, 2011, letter:

"… [T]he [d]raft EIR discussed [KVA] and it was considered in the analysis and implementation of [d]raft EIR MM 4.8-8. [MM 4.8-8] would require that the project proponents file a form 7460-1, Noti[ce] of Proposed Construction or Alteration, with the FAA for each [WTG], met[eorological evaluation] tower, transmission line tower, and construction crane meeting the FAA 7460 requirements for a determination of no hazard to air navigation. If the FAA determines that the project would result in a potential obstruction unless reduced to a specified height, the project proponents would be required to work with the FAA to resolve any adverse effects on aeronautical operations. This mitigation measure would ensure that the project's impacts on the environment would result in less than significant impact to existing aviation facilities and airspace use. [¶] … [¶]

"With regard to the concerns raised by Mr. Weinberg regarding the adequacy of the FAA's determinations on 'no hazard to air navigation,[']

16.

Staff notes that the FAA is the expert federal Agency in the field of air navigation and in determining hazards to air navigation. A major component of the FAA's purpose is to ensure the safety of aircraft and the efficient use of airspace. The FAA has issued a 'Determination of No Hazard' for … both components of the project, including … North Sky River['s] and Jawbone Wind Energy['s] portions.

"This expert opinion is supported by a professionally prepared aeronautical study …. Additionally, Staff notes that 14 [Code of Federal Regulations] Part 77 requires the FAA to evaluate and produce a report on the construction of objects that may constitute a hazard to air navigation, for the purpose of ensuring the safety of aircraft and the efficient use of airspace. Thus, Staff concludes that it is appropriate for the County to rely upon the FAA's expertise in evaluating whether the project will have an impact on air navigation."

The County's staff further advised in an addendum report to the Board dated September 13, 2011:

"Generally, airports are protected from encroachment by surrounding properties through the establishment of land use compatibility plans for public use airports, by airports acquiring avigation easements, or by the purchase of buffer lands. Staff notes that the proposed project is not located within the sphere of influence of any adopted … Airport Land Use Compatibility Plan, nor has [KVA] actively pursued or attempted to establish any avigation easements on adjacent properties. With no other land use mechanism having been established by [KVA], the [County] concludes that the [FAA] is the most appropriate agency to make any final determinations as related to any Hazards to Flight associated with the proposed project. [¶] … [¶]

"… Staff notes that … an analysis of the proposed project and its potential impacts to [KVA] … was prepared by Mr. Ron Morgan in association with JDA Aviation Technology Solutions. Mr. Morgan is the former Director of the FAA's Air Traffic Services Division and is an expert in the field of aviation….

"As previously stated, it was the determination of the [County] that impact to [KVA] could be reduced to less than significant … with implementation of the identified mitigation measure[]. This conclusion was further verified by Mr. Morgan. Your Board should be advised that Mr. Weinberg disagrees with this conclusion. [Section] 15151 specifically states that a disagreement among experts does not make an EIR inadequate, but that the

17.

EIR should summarize the main points of disagreement among the experts. Staff notes that these points of contention as raised by Mr. Weinberg have been described in the … Final EIR, and in subsequent Staff Reports prepared for this project, pursuant to CEQA. Additionally, the [FAA] has been provided copies of the EIR and notifications of the proposed hearings. As of the time of this writing, Staff has not received any comments from the FAA indicating that additional analysis is required to determine whether or not construction of [WTG's] within the project boundary would result in a significant hazard to flight. It is the [County]'s determination that under CEQA, sufficient information has been included into the record regarding the potential impacts to [KVA] for your Board to take action today regarding the proposed project. Based on all information in the record, the [County] continues to believe that with implementation of [MM] 4.8-8, requiring submittal of a Form 7460 with the FAA, impacts will be reduced to a less th[a]n significant impact. [¶] … [¶]

"… [T]he project before your Board for consideration is a request to incorporate the [wind energy combining district] to various parcels within the project area. Although the Final EIR prepared for the project has identified preliminary locations for future [WTG's], these locations are subject to change based on compliance with the [County's] Zoning Ordinance and other micro-siting requirements presented in the EIR that have yet to take place. The FAA determinations have not been included into the record because at this time the existing zoning would not allow for the installation of any WTG['s] on site. Although the applicant may have formal determinations by the FAA as they relate to Determinations of No Hazard to Flight, Staff notes that these FAA determinations are preliminary and were submitted by the applicant to the FAA to determine whether there were any existing conditions that would prevent the implementation of [WTG's] within the project boundary. Any change in location and[/]or size of the proposed WTG's would require the project proponent to resubmit their Form 7460 to the FAA for consideration. [¶] … [¶]

"The commenter states that the owner of [KVA] was not contacted by the FAA regarding any hazard to flight determinations. Staff notes these determinations are made by the FAA and are outside the legal authority and control of the County. How the FAA makes these determinations are not germane to the land use actions before your Board for consideration today and are not subject to CEQA as it relates to this project. [¶] … [¶]

"… If approved, the project proponent will be required to submit building permits for proposed turbines. Prior to issuance of that building permit, [MM] 4.8-8 requires the project proponent to submit to Staff an adequate

18.

FAA 7460 determination. Implementation of this measure will ensure that any restrictions identified by the FAA will be incorporated into the proposed project…. [T]he FAA has been provided copies of the EIR and hearing notices for the proposed project. No evidence has been submitted into the record by the FAA indicating that additional information is necessary at this time…. Should the FAA determine that construction of [WTG's] at specific locations would result in significant hazards to flight, the project proponent will be required to either reduce the turbine size, relocate the turbine or simply not construct that turbine at that location…. [¶] … [¶]

"… Staff explains that the final layout o[f] WTG[']s will be determined through final engineering and micro-siting if the project is approved, and that the full extent of the proposed [wind energy combining district] zone corridors where the WTG[']s could be located have been fully analyzed in the EIR. Staff also explains that in analyzing the proposed [e]ffects of the [WTG's], the Final EIR took a 'worst-case' scenario approach and assumed that the applicants would utilize the largest and tallest possible [WTG's] and analyzed for a maximum height of 497 feet. Therefore, the possible impacts of any of the proposed [WTG] models have been disclosed. Staff notes that since that time, [North Sky River] has selected a WTG type that is less than 430 feet in height, which was analyzed in the EIR."

The Board conducted a public hearing on September 13, 2011. At the hearing, Morgan testified:

"My last six years I spent as the director of air traffic for FAA, responsible for all the air traffic operation, all the air space operation in the United States.

"The organization that deals with obstruction evaluation is an organization that worked for me when I was the director, so I'm fairly familiar with the processes and -- and rules that are -- are used by that organization. I continue as consultant working in that area with my partner, Ben Doyle … and we probably work a thousand wind turbines a year related to obstruction evaluation issues.

"There's been a lot said about the obstruction evaluation process and documentation provided to this case and the fact that it was not done correctly. I personally had the discussion with the obstruction evaluation specialist who performed the work. There are a number of activities that she needed to go through to make sure it was correct. I asked her about

19.

those, and I can stand here tonight and tell you that she did every one of those.

"We stand with 102 determinations of no hazard issued by the federal government authority with the appropriate standing to make that decision. And with those 102 determinations, I can tell you that [KVA] and the turbines which are being proposed can co-habitate with no hazard."

The Board thereafter determined that MM 4.8-8 mitigated the adverse effects of the project's WTG's on aviation safety, certified the EIR, and approved the project. The Board outlined the following in its mitigation monitoring program:

"**Steps to Compliance:**
"A.     The project proponents shall comply with all requirements to maintain the [FAA] Determination of No Hazard to Air Navigation.
"B.     The project proponents shall consult with the FAA to resolve adverse effects on aeronautical operations.
"C.     The project proponents shall submit documentation of all communications with the FAA and evidence of compliance with FAA requests to the [County's] Planning and Community Development Department.
"D.     The [County's] Planning and Community Development Department will verify prior to issuing building and grading permits for the disputed [WTG's] or areas."

**DISCUSSION**[16]

## I.     Overview of CEQA and the EIR process.

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 (*Mountain Lion*), citing § 21001.)  The statute "contains a 'substantive mandate' requiring public agencies to refrain from approving projects with significant environmental effects if 'there are feasible alternatives or mitigation measures' that can substantially lessen or avoid those effects." (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 98, italics omitted, quoting *Mountain Lion*, *supra,* at p. 134; accord §§ 21002, 21081.)  A "'[s]ignificant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Guidelines, § 15382.)  "If the physical change causes adverse economic or social effects on people, those adverse effects may be used as a factor in determining whether the physical change is significant."[17]  (*Id.*, § 15064, subd. (e); accord *id.*, §§ 15131, subd. (b), 15382.)

---

[16]     In violation of California Rules of Court, rule 8.204(a)(1)(B), CODE presents contentions in its brief that are not listed "under a separate heading or subheading …." Thus, we decline to address these contentions.  (See, e.g., *Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 314, fn. 24; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 542.)

Also, respondents and North Sky River assert for the first time on appeal that CEQA does not apply in this case on the basis that the statute does not regulate environmental impacts that do not affect the public at large.  We do not consider new matters raised for the first time on appeal.  (See, e.g., *A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1804; *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 737.)

[17]     "For example, if the construction of a new freeway or rail line divides an existing community, the construction would be the physical change, but the social effect on the

21.

"Whenever a project may have a significant and adverse physical effect on the environment, an EIR must be prepared and certified." (*Mountain Lion, supra*, 16 Cal.4th at p. 113, citing § 21100, subd. (a); accord § 21151, subd. (a).) This process entails "the preparation of a draft EIR; the circulation of that draft for comment; the preparation of a final EIR which responds to those comments; and the certification that the final EIR has been completed in compliance with CEQA."[18] (*Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 220, citing *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123-1124 (*Laurel Heights II*).) The EIR "is the mechanism prescribed by CEQA to force informed decision making and to expose the decision making process to public scrutiny." (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 910.) As "'the heart of CEQA'" (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 392, quoting Guidelines, § 15003, subd. (a)), the EIR "provides the public and responsible government agencies with detailed information on the potential environmental consequences of an agency's proposed decision," and "describes ways to minimize significant environmental effects, and suggests alternatives to the project, including the option of 'no project.'" (*Mountain Lion*, *supra*, at p. 113, citing § 21061; accord § 21002.1, subd. (a).)

"The core of an EIR is the mitigation and alternatives sections." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564.) "An EIR shall describe feasible [mitigation] measures which could minimize significant adverse

community would be the basis for determining that the effect would be significant. As an additional example, if the construction of a road and the resulting increase in noise in an area disturbed existing religious practices in the area, the disturbance of the religious practices could be used to determine that the construction and use of the road and the resulting noise would be significant effects on the environment." (Guidelines, § 15131, subd. (b).)

[18] While public hearings are encouraged, they are not required at any stage of the EIR process. (Guidelines, §§ 15087, subd. (i), 15202, subd. (a); cf. *id.*, § 15201.)

impacts ….'' (Guidelines, § 15126.4, subd. (a).) Such measures "[a]void[] the impact altogether by not taking a certain action or parts of an action," "[m]inimiz[e] impacts by limiting the degree or magnitude of the action and its implementation," "[r]ectify[] the impact by repairing, rehabilitating, or restoring the impacted environment," "[r]educ[e] or eliminat[e] the impact over time by preservation and maintenance operations during the life of the action," or "[c]ompensat[e] for the impact by replacing or providing substitute resources or environments." (*Id.*, § 15370.) In addition, "[a]n EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (*Id.*, § 15126.6, subd. (a).) Whether a mitigation measure or alternative is feasible "involves a balancing of various 'economic, environmental, social, and technological factors.'" (*City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417, quoting § 21061.1; see Guidelines, § 15364 ["'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors."].)

## II.     Standards of review.

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.'" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard*), quoting § 21168.5.) "Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard*, *supra*, at pp. 426-427, quoting § 21168.5.)

Where the alleged defect predominantly relates to a legal error, such as improper procedure, the courts determine de novo whether the agency either complied with "'legislatively mandated CEQA requirements' [citation]" or "'failed to proceed in the

manner prescribed by CEQA.' [Citations.]" (*Vineyard*, *supra*, 40 Cal.4th at p. 435; see *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118 ["[Q]uestions of interpretation or application of the requirements of CEQA are matters of law."].) Under this standard, the courts evaluate the EIR's "'sufficiency as an informative document.' [Citation.]" (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 392.) "Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391; see, e.g., *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 986 ["An EIR will be found legally inadequate—and subject to independent review for procedural error—where it omits information that is both required by CEQA and necessary to informed discussion."].)

Where the alleged defect predominantly relates to a factual dispute, such as "'whether adverse effects have been mitigated or could be better mitigated' [citation]," the courts "accord greater deference to the agency's substantive factual conclusions." (*Vineyard*, *supra*, 40 Cal.4th at p. 435; see *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497 ["The decisions of the agency are given substantial deference and are presumed correct. The parties seeking mandamus bear the burden of proving otherwise …."].)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: [t]he appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard*, *supra*, 40 Cal.4th 412 at p. 427; see *Association of Irritated Residents v. County of Madera*, *supra*, 107 Cal.App.4th at p. 1390 ["'The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it.'"].)

**III.    As a matter of law, the County's EIR described a legally feasible mitigation measure.**

At the outset, CODE contends the County "abdicat[ed] its statutory duty under CEQA to identify … [a] mitigation measure that would … keep the Project from causing … adverse and potentially fatal air navigation impacts" and, in lieu of exercising its power to regulate land use (see Cal. Const., art. XI, § 7; *City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 742-743), "hid[] behind the fig leaf of a non-existent federal preemption."

First, to the extent CODE suggests the County's EIR failed to describe a mitigation measure that could avoid or minimize significant impacts to aviation safety (see Guidelines, § 15126.4, subd. (a)), we disagree.  The EIR identified MM 4.8-8, which required North Sky River and Jawbone to submit Form 7460-1 "Notice of Proposed Construction or Alteration" to the FAA, and obtain from the FAA, a "Determination of No Hazard to Air Navigation" for each WTG.  (See generally 14 C.F.R. §§ 77.7, 77.9, 77.31.)  If the FAA found any adverse effects on aeronautical operations, North Sky River and Jawbone, in consultation with the FAA, had to remedy those effects before they could obtain building permits from the County.  If no such effects were found, North Sky River and Jawbone were nonetheless obligated to observe the federal agency's rules and regulations, so as to maintain this determination, and submit proof of compliance to respondents.  "[A] condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance."  (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906.)

Second, we reject CODE's claim that the County "hid[] behind the fig leaf of a non-existent federal preemption" and consequently failed to exercise its "express or implied powers" to mitigate a significant environmental impact (§ 21004).  The goal of a mitigation measure is "to reduce the impact [of a proposed project] to insignificant

25.

levels." (*Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 529.) In the instant case, the impact at issue concerned aviation safety. "[F]ederal law occupies the entire field of aviation safety" (*Montalvo v. Spirit Airlines* (9th Cir. 2007) 508 F.3d 464, 473; accord *Sierra Pacific Holdings, Inc. v. County of Ventura* (2012) 204 Cal.App.4th 509, 515; *Booth v. Santa Barbara Biplane Tours, LLC* (2008) 158 Cal.App.4th 1173, 1180; see 49 U.S.C. § 40103(a)(1) ["The United States Government has exclusive sovereignty of airspace of the United States."]) and the FAA "exercise[s] *sole discretion* in regulating air safety" (*Abdullah v. American Airlines, Inc.* (3d Cir. 1999) 181 F.3d 363, 369, italics added; see 49 U.S.C. § 40103(b)(1); *Air Line Pilots Association, International v. Quesada* (2d Cir. 1960) 276 F.2d 892, 894 ["The Federal Aviation Act was passed by Congress for the purpose of centralizing in a single authority -- indeed, in one administrator -- the power to frame rules for the safe and efficient use of the nation's airspace."]).

Pursuant to title 49 United States Code sections 40103 and 44718, the FAA promulgated 14 Code of Federal Regulations part 77 (*Big Stone Broadcasting, Inc. v. Lindbloom* (D.S.D. 2001) 161 F.Supp.2d 1009, 1011, 1015-1016), which "establishes standards for determining obstructions in navigable airspace, sets forth the requirements for notice of certain proposed construction plans, provides aeronautical studies to determine the effect of any proposed construction on the safe and efficient use of airspace, and provides for public hearings on the hazardous effect of any proposed construction." (*Id*. at p. 1016; see *Aircraft Owners & Pilots Association v. Federal Aviation Administration* (D.C. Cir. 1979) 600 F.2d 965, 966 (*Aircraft Owners*).) These standards, in particular, apply to wind farms proposals. (See, e.g., *Town of Barnstable v. Federal Aviation Administration* (D.C. Cir. 2011) 659 F.3d 28, 30-31; *Clark County v. Federal Aviation Administration* (D.C. Cir. 2008) 522 F.3d 437, 439-440.) "Once the FAA has been given notice under Part 77, the FAA's Obstruction Evaluation Service has the responsibility for conducting an 'obstruction evaluation' to determine the effect, if

any, that the proposed construction or alteration would have on navigable airspace. [Citation.] The result of a study under Part 77 'is normally a determination as to whether the specific proposal studied would be a hazard to air navigation.' [Citation.]" (*Goodspeed Airport, LLC v. East Haddam Inland Wetlands & Watercourses Commission* (D. Conn. 2010) 681 F.Supp.2d 182, 194-195.)

Although CODE correctly points out that the FAA could not enforce its own "hazard/no-hazard" determinations (see *Aircraft Owners*, *supra*, 600 F.2d at p. 966), it incorrectly assumes that this rendered MM 4.8-8 legally infeasible. (See *Masonite Corp. v. County of Mendocino* (2013) 218 Cal.App.4th 230, 238 ["The legal feasibility of a mitigation measure is not a question of fact reviewed for substantial evidence but rather is an issue of law that we review de novo."].) "The FAA is not empowered to prohibit or limit construction it deems dangerous to air navigation." (*Aircraft Owners*, *supra*, 600 F.2d at p. 967; see *Gustafson v. City of Lake Angelus* (6th Cir. 1996) 76 F.3d 778, 784 ["The FAA has acknowledged that land use matters within the federal aviation framework are intrinsically local."]; *id*. at p. 786; FAA Order JO 7400.2H, *supra*, § 5-1-2a ["It should be noted[,] however, that Section 44718 does not provide specific authority for the FAA to regulate or control how land (real property) may be used in regard to structures that may penetrate navigable airspace."].) Nevertheless, "a hazard/no-hazard determination … has substantial practical impact" (*Aircraft Owners*, *supra*, at pp. 966-967, fn. omitted) because it "can hinder the project sponsor in acquiring insurance, securing financing or *obtaining approval from state or local authorities*" (*BFI Waste Systems of North America, Inc. v. Federal Aviation Administration* (2002) 293 F.3d 527, 530, italics added). Thus, while the FAA could not halt construction of North Sky River and Jawbone's WTG's if it deemed those structures hazardous, under MM 4.8-8 the County was bound to do so through the exercise of its police power. (See § 21081.6, subd. (b) ["A public agency shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions …."]; see also

27.

*Scrutton v. County of Sacramento* (1969) 275 Cal.App.2d 412, 418 [local government's power to regulate land use includes power to grant building permits contingent on the applicant's compliance with reasonable conditions].)**19**

IV. **As a matter of law, the County was not required to respond to late comments.**

"[A]fter a [draft EIR] has been completed, it must be made available to interested parties and the public for their comments." (*Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1666, citing Guidelines, § 15087; accord § 21092.) "The lead agency shall evaluate comments on environmental issues received from persons who reviewed the draft EIR and shall prepare a written response. The lead agency shall respond to comments received during the noticed comment period and any extensions and may respond to late comments." (Guidelines, § 15088, subd. (a); accord § 21091, subd. (d)(1).) "When a comment raises a significant environmental issue, the lead agency must address the comment 'in detail giving reasons why' the comment was 'not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice.'" (*The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 615, quoting Guidelines, § 15088, subd. (c); see *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 391 ["If the agency rejects a recommendation or objection concerning a significant environmental issue, the response must explain the reasons why."].) "The requirement of a detailed written response to comments helps to ensure that the lead agency will fully consider the environmental consequences of a decision before it is made, that the decision is well informed and open to public scrutiny, and that public participation in the environmental review process is meaningful." (*City of Long*

---

**19** Because the EIR described a legally feasible mitigation measure, as required by CEQA, we need not answer CODE's enigmatic question as to whether federal aviation law "preempted" the County from identifying and imposing such a measure. (See *ante*, at p. 4; cf. *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 934, fn. 7.)

*Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 904, citing *People v. County of Kern* (1974) 39 Cal.App.3d 830, 841-842.)

On this issue, CODE makes one specific contention: the County "dismissed" the comment that "MM 4.8-8 would not eliminate the Project's acknowledged potentially dangerous aviation impacts on KVA because [North Sky River] was shutting [Athuil] out of the Form 7460-1 process[.]" The record before us, however, indicates that this comment was first brought to the County's attention on or after August 10, 2011, more than a month after the public review period ended. "Under CEQA, the lead agency *may*, but is not required to, respond to late comments." (*Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1110, italics added; accord § 21091, subd. (d)(2)(B); Guidelines, §§ 15207, 15088, subd. (a), 15089, subd. (b); see Guidelines, § 15005, subd. (c) ["'May' identifies a permissive element which is left fully to the discretion of the public agencies involved."].) Because the County had no legal duty to address the comment, CODE's contention, even if true, "is not sufficient to render approval of the CEQA project ineffective or contrary to law." (*Gray v. County of Madera*, *supra*, at p. 1111.)

**V.    Substantial evidence supported the Board's conclusion that MM 4.8-8 mitigated significant impacts on aviation safety.**

"For projects for which an EIR has been prepared, where substantial evidence supports the approving agency's conclusion that mitigation measures will be effective, courts will uphold such measures against attacks based on their alleged inadequacy." (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027.) "'Substantial evidence' … means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Our Supreme Court explained:

> "In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and

decision.' [Citation.]… [¶] A court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument …. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that '[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]" (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 393.)

The appellant has the burden to demonstrate that the evidence in the administrative record did not sufficiently justify the agency's action. (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 112.)

We conclude that substantial evidence supported the Board's conclusion that MM 4.8-8 mitigated significant impacts on aviation safety. Staff reports to the Board show that, in consideration of federal law (see *ante*, at pp. 24-26), the County relied on the FAA, which has sole discretion over matters of air safety, to assess adverse impacts of the project's WTG's on the safe use of navigable airspace around KVA. MM 4.8-8, as described in the EIR and staff reports, explicitly required North Sky River and Jawbone, prior to issuance of building permits, to participate in the FAA's Obstruction Evaluation Process and obtain, as well as maintain, no-hazard determinations for each WTG. Morgan, North Sky River's aviation expert and a former director of the FAA's air traffic services division, advised in his airspace and obstacle evaluation study that the FAA had the means to mitigate turbine development in close proximity to private airport finals through its Obstruction Evaluation Process, had analyzed 102 of the project's WTG's, and had issued no-hazard determinations for each WTG prior to project approval. Morgan also testified that he spoke to the FAA specialist who performed the evaluation

30.

and verified that the specialist proceeded in the proper manner.[20]  In view of the County's reliance on federal aviation standards (cf. *Oakland Heritage Alliance v. City of Oakland*, *supra*, 195 Cal.App.4th at pp. 904, 905 [upholding city's finding that compliance with state building code standards, in conjunction with other requirements, provided substantial evidence that mitigation measures adequately reduced seismic impacts to a less than significant level]), staff reports (see *Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 866 ["An agency may also rely upon the opinion of its staff in reaching decisions, and the opinion of staff has been recognized as constituting substantial evidence."]), and Morgan's expert opinion[21] (see Guidelines, § 15384), the Board's conclusion as to the efficacy of MM 4.8-8 was supported by substantial evidence.

The parties do not dispute that North Sky River had informed the FAA about its share of WTG's, participated in the Obstruction Evaluation Process, and successfully obtained "preliminary" no-hazard determinations for each of its WTG's before the project was approved by the Board.  CODE essentially argues that certain flaws were revealed during this assessment that demonstrated MM 4.8-8's inefficacy.  First, North

---

**20**    Although the reports from the County's staff and Morgan were submitted in response to late comments, "[c]ourts have found that … approval of a CEQA project can be supported by substantial evidence found in the responses to late comments."  (*Gray v. County of Madera*, *supra*, 167 Cal.App.4th at pp. 1110-1111, citing *Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at pp. 567-568.)

**21**    CODE challenges Morgan's credibility.  Ordinarily, credibility findings cannot be reversed by a reviewing court applying the substantial evidence standard unless the testimony is incredible on its face or inherently improbable.  (*Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201.)  For testimony to be inherently improbable, "'there must exist either a physical impossibility that [it is] true, or [its] falsity must be apparent without resorting to inferences or deductions.'"  (*Daly v. Wallace* (1965) 234 Cal.App.2d 689, 692, quoting *People v. Huston* (1943) 21 Cal.2d 690, 693.)  Here, CODE has not shown that Morgan's testimony was obviously false or included assertions of fact that were physically impossible.

Sky River withheld information about KVA from the FAA to prevent the federal agency from analyzing the project in relation to the airport. Second, according to Long, Athuil's aviation expert and a former FAA airport certification and safety inspector, the FAA failed to contact Athuil during the Obstruction Evaluation Process in "direct violation of the formal process, procedures and protocol required by the operating rules and policies of the FAA," thus undermining the credibility of the evaluation. Third, the FAA only conducted a cursory "'auto-screened'" review.

Assuming arguendo that CODE's allegations are true, our task "is not to weigh conflicting evidence and determine who has the better argument" and we "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 393.) In spite of this, we do note the following: First, the County's staff related in its September 13, 2011, addendum report to the Board that the FAA received copies of the EIR and public hearing notices and were therefore aware of KVA's presence. Second, in his study, Morgan disagreed with Long and explained that circularization was unnecessary because the planned WTG's did not exceed obstruction standards, affect a public airport, have a possible Visual Flight Rule effect, or require a change in aeronautical operations or procedures. (See FAA Order JO 7400.2H, *supra*, § 6-3-17a; see also *Oakland Heritage Alliance v. City of Oakland*, *supra*, 195 Cal.App.4th at p. 900 ["'[A] public agency may choose between differing expert opinions.'"].) Finally, Morgan attested that he contacted the FAA and confirmed that the case was reviewed, not auto-screened. (See *Association of Irritated Residents v. County of Madera*, *supra*, 107 Cal.App.4th at p. 1397 ["When the evidence on an issue conflicts, the decisionmaker is 'permitted to give more weight to some of the evidence and to favor the opinions and estimates of some of the experts over the others.'"].)

We conclude that CODE did not meet its burden under the stringent substantial evidence standard. (See *In re Michael G.* (2012) 203 Cal.App.4th 580, 589 ["The

substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts."].)

**VI.    The Board was not required to adopt either CODE's proffered mitigation measure or the EIR's "Environmentally Superior Alternative."**

CODE asserts the Board improperly rejected its proffered mitigation measure: relocation of WTG's from the ridgelines and flight paths of aircraft using KVA.[22]  CODE also asserts the Board improperly rejected the EIR's Alternative C, which removed up to 23 WTG's from the site.

We reject both propositions.  "A public agency shall not decide to approve or carry out a project for which an EIR was prepared unless … [¶] … [¶]  … [t]he agency has … [¶]  … [e]liminated or substantially lessened all significant effects on the environment where feasible …."  (Guidelines, § 15092, subd. (b)(2)(A); accord § 21081, subd. (a)(1).)  Logic dictates that "[i]f adopted mitigation measures will substantially lessen a significant environmental impact, the agency need not take further steps to mitigate that impact."  (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2013) Project Approval & Findings, § 17.20, p. 816; see, e.g., *A Local & Regional Monitor v. City of Los Angeles*, *supra*, 12 Cal.App.4th at p. 1810; see also *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1519 ["[A]gency need not, under CEQA, adopt every nickel and dime mitigation scheme brought to its attention or proposed in the project EIR …."].)  Because substantial evidence supported its determination that MM 4.8-8 was effective, the Board did not have to adopt additional mitigation.

---

[22]    CODE also described this mitigation measure as an "alternative."  (See *Laurel Heights I*, *supra*, 47 Cal.3d at p. 403 ["[A]lternatives and mitigation measures have the same function—diminishing or avoiding adverse environmental effects…. [A]lternatives are a type of mitigation."].)

33.

With regard to Alternative C, the case law is more definitive: "CEQA does not require the lead agency to choose the environmentally best alternative identified in an EIR if … through the imposition of feasible mitigation measures identified in the report the environmental damage from a project can be reduced to an acceptable level …." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 731; accord *Laurel Heights I*, *supra*, 47 Cal.3d at p. 402; see *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 490; *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 379 [CEQA does not require an agency to consider feasibility of proposed alternatives once it determined that mitigation measures avoided or substantially lessened that impact].)

## DISPOSITION

The judgment of the superior court is affirmed. Costs on appeal are awarded to respondents and real parties in interest.

The motion filed by CODE for judicial notice is denied. The request filed by North Sky River for judicial notice is granted. The request by Jawbone and Philip Rudnick to be dismissed from this appeal is denied.

_____
DETJEN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
FRANSON, J.

34.

## <u>CERTIFIED FOR PUBLICATION</u>

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITIZENS OPPOSING A DANGEROUS ENVIRONMENT, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF KERN et al., <br><br> Defendants and Respondents; <br><br> NORTH SKY RIVER ENERGY, LLC et al., <br><br> Real Parties in Interest and Respondents; <br><br> JAWBONE WIND ENERGY, LLC et al., <br><br> Real Parties in Interest and Respondents. | F067567 <br><br> (Super. Ct. No. CV-275009) <br><br><br> **ORDER GRANTING REQUEST FOR PUBLICATION** |

It appearing that part of the nonpublished opinion filed on June 30, 2014, in the above entitled matter meets the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that the opinion be certified for publication in the Official Reports with the exception of parts IV., V., and VI. of Discussion.

_____
DETJEN, J.

WE CONCUR:

_____
LEVY, Acting P.J.

_____
FRANS

35.