Filed 6/7/16  Naraghi Lakes Neighborhood Preservation Assn. v. Berberian Holdings CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| NARAGHI LAKES NEIGHBORHOOD PRESERVATION ASSOCIATION, Plaintiff and Appellant, v. CITY OF MODESTO, Defendant and Respondent; BERBERIAN HOLDINGS, L.P., Real Party in Interest and Respondent. | F071768 (Super. Ct. No. 2006259) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Frank Dougherty, Judge.  (Retired Judge of the Merced Super. Ct. assigned by the Chief Justice pursuant to article VI, § 6 of the Cal. Const.)

Law Office of Donald B. Mooney and Donald B. Mooney for Plaintiff and Appellant.

Meyers, Nave, Riback, Silver & Wilson and Edward Grutzmacher for Defendant and Respondent.

Downey Brand and Donald Sobelman for Real Party in Interest and Respondent.

-ooOoo-

Following the approval by the City of Modesto (the City) of a shopping center project (the project) that would be adjacent to an established residential neighborhood, Naraghi Lakes Neighborhood Preservation Association (appellant) filed a petition for writ of mandate challenging the approval of the project. Appellant claimed the City failed to follow the City of Modesto Urban Area General Plan (the General Plan), and did not adequately comply with certain requirements of the California Environmental Quality Act (CEQA).[1] The trial court denied the writ petition and entered judgment in favor of the City. Appellant appeals, contending the project was improperly approved and the petition should have been granted because, allegedly, (1) the project was inconsistent with the General Plan regarding the size of neighborhood shopping centers, (2) the City failed to make findings necessary under the General Plan's rezoning policy, (3) the City failed to comply with CEQA because the environmental impact report (EIR) improperly rejected feasible mitigation measures as to traffic impacts, and (4) no substantial evidence supported the City's CEQA findings regarding urban decay and the statement of overriding considerations. Having reviewed appellant's contentions in light of the entire record, we are unable to conclude that the City prejudicially abused its discretion on any of the grounds raised. Accordingly, the judgment of the trial court is affirmed.

## FACTS AND PROCEDURAL HISTORY

*The Project Description*

The project proposed by real party in interest Berberian Holdings, L.P. (real party) is the construction of a new shopping center on approximately 18 acres of vacant land situated in northeast Modesto. The new shopping center, as proposed, will include

---

[1] CEQA is found at Public Resources Code section 21000 et seq.

Unless otherwise indicated, all further statutory references are to the Public Resources Code.

CEQA's policies are implemented through regulations known as the CEQA Guidelines (Guidelines) found at California Code of Regulations, title 14, section 15000 et seq.

approximately 170,000 square feet of floor area, with a grocery store serving as the anchor tenant.  The proposed site of the project is two contiguous parcels, one 12 acres in size and one six acres in size, bounded by Sylvan Avenue (north), undeveloped land and a storm water detention basin (south), Oakdale Road (east) and Hashem Drive (west).  The completed project (i.e., the new shopping center) as proposed by real party will have two large buildings, one that is 78,290 square feet and another that is 66,230 square feet, each of which will be partitioned into spaces for various tenants.  The smaller building is planned to include a 51,730 square foot area for the anchor grocery store tenant.  Four freestanding pad buildings, ranging in size from 4,200 square feet to 7,670 square feet, are also part of the overall project.  The project calls for 816 parking spaces.

An established residential neighborhood borders the project site on the west side along Hashem Drive.  The project will provide an eight-foot tall masonry wall with a decorative cap along the west and south property lines.  A 16-foot wide landscaped planter on the west side of the masonry wall will provide a further buffer between the development and the residences to the west.  The project will be required to provide layered landscaping, shrubs and ornamental trees in the 16-foot wide planter area.

The project necessitates a General Plan Amendment to redesignate the project site from Mixed-use (MU) and Residential (R) zoning to Commercial (C), and to rezone the same property from Planned Development Zone P-D(211) to a new Planned Development Zone, to allow development of a shopping center.

### General Plan's Neighborhood Plan Prototype (NPP)

There is no dispute that the project site is located within an area covered by the NPP policies of the General Plan.  The General Plan, at chapter III, part C, paragraph 2, explains the purpose of the NPP policies as follows:  "The [NPP] was developed in 1974 to provide a 'blueprint' for development of future residential neighborhoods. The [NPP] is designed to create residential areas served by neighborhood parks, elementary schools, a neighborhood shopping center, and a collector street pattern connecting these uses.  The

3.

[NPP] is a model for: subdivision designs, location of parks and other capital facilities, and zoning and pre-zoning studies. As of the baseline year of 1995, much of the Baseline Developed Area has been developed according to this Prototype. [¶] Within the Modesto community, 'Neighborhoods' are typically one mile by 3/4 mile (approximately 480 acres in size), and bordered by Arterial streets or Expressways."

The General Plan's NPP provisions then go on to describe the various *policies* that are applicable to the subject neighborhoods. After stating policies relating to housing types and the location of elementary schools and parks within each neighborhood, the NPP policies call for a neighborhood shopping center, described as follows: "A 7-9 acre neighborhood shopping center, containing 60,000 to 100,000 square feet of gross leasable space, should be located in each neighborhood. The shopping center should be located at the intersection of two Arterial streets, as shown in Figure III-2." (General Plan, ch. III, part C, § 2, ¶ d,)

### The Site's Entitlement History

The same site has been approved for commercial development as a shopping center on two occasions prior to the instant project. Historically, the zoning for that location has been P-D(211), which allows condominium apartments and cluster houses. In 1981, the City approved a rezoning of the 12-acre parcel[2] to allow for the development of a shopping center at the corner of Sylvan Avenue and Oakdale Road. When that project did not get developed, the zoning was returned back to P-D(211). In 1987, the City again approved a request to rezone the 12-acre parcel for a shopping center development. When the planned shopping center did not proceed within the time limit for development, the City repealed the zoning changes and returned the zoning to P-D(211). The two shopping center entitlements previously approved (in 1981 and 1987)

---

**2**    Recall that the entire project site is 18 acres, consisting of two vacant parcels, one of 12 acres and one of six acres. The past entitlements involved the 12-acre parcel only.

4.

for this site entailed proposed developments that were approximately 12 acres in size with approximately 80,000 square feet of leasable space.

***Real Party's Initial Application and City's Initial Environmental Study***

In November 2011, real party submitted an application to obtain necessary approvals for the proposed project. As noted above, the project set forth in real party's application consisted of a shopping center development on the 18-acre site at the corner of Sylvan Avenue and Oakdale Road, including approximately 170,000 square feet of leasable space with a grocery store as the anchor tenant. The completed shopping center would be called The Marketplace. It would also include an eight-foot tall wall and landscaping as a buffer on the western side of the shopping center along Hasham Drive. Additionally, an integral part of the project was a General Plan amendment to redesignate the project site from Mixed-use (MU) and Residential (R) to Commercial (C) and to rezone the same property from Planned Development Zone, P-D(211) to new Planned Development Zone (P-D) to allow development of a shopping center on the project site.

On May 11, 2012, the City released the results of an initial study, which reported that the Project was within the scope of the General Plan master EIR (MEIR) and that, pursuant to CEQA, no additional environmental review was required. The initial study concluded that the project would have no significant effects on the environment and was consistent with the General Plan and the MEIR. Regarding traffic impacts, the initial study included a traffic study prepared by the engineering firm of Kimley-Horn & Associates (the first traffic study).

The project was first brought before the City of Modesto Planning Commission (the Planning Commission) on August 6, 2012, and testimony was received. A second hearing before the Planning Commission took place on September 17, 2012. Appellant and individual residents of the neighborhood nearby the project site submitted letters stating their concerns or objections to the project due to apparent adverse impacts on the environment such as urban decay, traffic, noise, and General Plan inconsistency. The

5.

Planning Commission recommended approval of the project by the city council, and a public hearing before the city council was set for October 23, 2012.

On October 23, 2012, appellant submitted a detailed comment letter to the city council, setting forth purported deficiencies in the City's and/or the planning staff's assessment of the project's impacts. Appellant asserted that the project created significant traffic, noise, urban decay, General Plan inconsistency and other environmental impacts. In addition, appellant submitted a peer-reviewed traffic memorandum, prepared by VRPA Technologies, which asserted that the first traffic study used incorrect methodologies to measure traffic impacts. VRPA's memorandum asserted that when the proper methodology was used, there were unmitigated traffic impacts of a significant nature at several intersections. The city council ultimately continued the public hearing to January 8, 2013.

On January 3, 2013, real party submitted a letter to the city council, acknowledging that the most efficient course of action would be to prepare a project EIR, since that process would allow the issues raised in appellant's letter to be analyzed and put to rest. The project application was taken off of the city council's meeting agenda and the EIR process formally began with the notice of preparation on February 4, 2013.

*The EIR Process and Project Approval*

The draft EIR (DEIR) was completed on June 19, 2013, and a public comment period commenced on June 20, 2013, and continued through August 5, 2013. The DEIR included a new, much more extensive traffic analysis. Based on that analysis, the DEIR acknowledged the existence of significant traffic impacts that were allegedly unavoidable at several intersections and roadway segments near the proposed project. The City received only three comment letters on the DEIR, two from public agencies and one from appellant. Appellant's comment letter included a memorandum from its traffic consultant pointing out that the DEIR's analysis of traffic impacts had misapplied certain of the City's thresholds of significance. The City apparently agreed because it promptly revised

6.

the traffic report and the relevant sections of the DEIR and issued a recirculated DEIR (RDEIR) for public comment from August 26 to October 10, 2013. The City received only three comment letters on the RDEIR, the same three as before. Appellant submitted a comment letter concerning the RDEIR, outlining alleged deficiencies in the RDEIR's analysis of impacts, alternatives and mitigation measures. The City responded to all comment letters received on both the DEIR and RDEIR in the final EIR (FEIR).[3]

On November 18, 2013, after nine months of work on the EIR, the project returned to the Planning Commission. Testimony was received at the hearing. Appellant's attorney spoke against the project, emphasizing the significant impacts on traffic that would not be adequately mitigated and General Plan inconsistency, among other things. The Planning Commission believed the concerns expressed by appellant were adequately addressed in the EIR. At the conclusion of the hearing, the Planning Commission adopted resolutions recommending that the city council certify the EIR and approve the project.

On December 10, 2013, the city council held its first public hearing on the EIR and the project. Appellant submitted written objections to the project, including challenges to the EIR's conclusions regarding infeasibility of certain mitigation measures as to traffic impacts. At the conclusion of the hearing, the city council closed the public hearing and continued consideration of the EIR and project to allow staff time to review appellant's recent submittal to ensure that the EIR had fully and adequately analyzed all environmental impacts.

We note that the EIR in this case followed a standard organizational approach that sought to address all of the necessary issues. Among other things, it described the

---

**3** Unless otherwise indicated, the term EIR refers to the FEIR, which is understood to include and incorporate (1) the DEIR and the RDEIR, (2) all comments received, (3) the City's responses to comments or points raised in the review process, and (4) any other information added by the City. (Guidelines, § 15132.) We sometimes refer to the FEIR or DEIR separately, when it is helpful or convenient to do so.

project, summarized the potentially significant environmental impacts, discussed development alternatives to the project, and analyzed mitigation measures, including a delineation of which measures were feasible and which were infeasible. Further, the EIR in this case included a detailed description of the project's traffic impacts at several intersections and roadway segments that would be significant impacts but mitigation would allegedly be infeasible. The EIR also purported to explain why the project, despite its size, was in harmony with the policies of the General Plan.

On January 7, 2014, the city council adopted resolutions Nos. 2014-16 through 2014-18, certifying the EIR and making necessary project approvals. The city council also conducted the first reading of ordinance No. 3597-C.S., which was approved on the consent calendar at the January 14, 2014, city council meeting. The approvals included certification of the EIR and other CEQA findings, approval of the project application, and amendment to the General Plan and zoning. The City posted a notice of determination regarding the project on January 8, 2014.

### Petition for Writ of Mandate

On February 6, 2014, appellant filed its verified petition for writ of mandate and complaint for declaratory relief (the petition) in the trial court. On March 5, 2015, after full briefing on the issues and a hearing, the trial court denied the relief sought in the petition. In its written order, the trial court reviewed the record and rejected each of appellant's claims. No abuse of discretion was found by the trial court. Judgment was entered in favor of the City and real party, and against appellant, on March 30, 2015. This appeal followed.

## DISCUSSION

### I. General Plan Consistency

Appellant argues the project was in conflict with the General Plan in several key respects and that, consequently, the City abused its discretion in approving the project. Among the claims of General Plan inconsistency, appellant argues that the project did not

comply with the NPP policy regarding the size of the shopping center, and that certain mandatory findings necessary to rezoning of the site were not made. We begin by summarizing the applicable law and the standard of review relating to challenges based on alleged General Plan inconsistency.

### A. Applicable Law and the Standard of Review

A city must adopt a "comprehensive, long-term general plan" for its physical development. (Gov. Code, § 65300.) The general plan serves as a "'charter for future development'" and contains the city's fundamental policy decisions about such development. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1194.) The policies in a general plan typically reflect a range of competing interests. (*Ibid.*; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 (*Save our Peninsula*).) "General plans ordinarily do not state specific mandates or prohibitions. Rather, they state 'policies,' and set forth 'goals.'" (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 378 (*Napa Citizens*).) Nevertheless, a city's land use decisions must be consistent with the policies expressed in its general plan. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570; *Lesher Communications, Inc. v. City* of *Walnut Creek* (1990) 52 Cal.3d 531, 536; *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815 (*Friends of Lagoon Valley*); Gov. Code, § 65860.) "'[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.'" (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, at p. 570.)

The rule of general plan consistency is that the project must at least be *compatible with* the objectives and policies of the general plan. (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717–718 (*Sequoyah Hills*); *Friends of Lagoon Valley*, *supra*, 154 Cal.App.4th at p. 817.) "[S]tate law does not require precise conformity of a proposed project with the land use designation for a site, or an exact

9.

match between the project and the applicable general plan.  [Citations.]  Instead, a finding of consistency requires only that the proposed project be '*compatible* with the objectives, polices, general land uses, and programs specified in' the applicable plan.  [Citation.] The courts have interpreted this provision as requiring that a project be '"in agreement or harmony with"' the terms of the applicable plan, not in rigid conformity with every detail thereof."  (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678 (*San Franciscans*).)  To reiterate, the essential question is "whether the project is compatible with, and does not frustrate, the general plan's goals and policies."  (*Napa Citizens*, *supra*, 91 Cal.App.4th at p. 378.)

As has been accurately observed by one court:  "It is beyond cavil that no project could completely satisfy every policy stated in [a city's general plan], and that state law does not impose such a requirement.  [Citation.]  A general plan must try to accommodate a wide range of competing interests … and to present a clear and comprehensive set of principles to guide development decisions.  Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.]  It is, emphatically, *not* the role of the courts to micromanage these development decisions.  Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence.  [Citations.]"  (*Sequoyah Hills*, *supra*, 23 Cal.App.4th at pp. 719–720.)

Where, as here, a governing body has determined that a particular project is consistent with the relevant general plan, that conclusion carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion.  (*Friends of Lagoon Valley*, *supra*, 154 Cal.App.4th at p. 816; *Napa Citizens*, *supra*, 91 Cal.App.4th at p. 357; *Sequoyah Hills*, *supra*, 23 Cal.4th at p. 717.)  "We may neither substitute our

10.

view for that of the city council, nor reweigh conflicting evidence presented to that body." (*Sequoyah Hills*, *supra*, at p. 717.)

Moreover, judicial review of consistency findings is highly deferential to the local agency. (*Friends of Lagoon Valley*, *supra*, 154 Cal.App.4th at p. 816.) "[C]ourts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]'" (*San Franciscans*, *supra*, 102 Cal.App.4th at pp. 677–678, quoting from *Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 142.)

In our review of the City's consistency findings in this case, our role is the same as that of the trial court; we independently review the City's actions and are not bound by the trial court's conclusions. (*Napa Citizens*, *supra*, 91 Cal.App.4th at p. 357.) In applying the substantial evidence standard, we resolve reasonable doubts in favor of the City's finding and decision. (*Ibid*.) The essential inquiry is whether the City's finding of consistency with the General Plan was "reasonable based on the evidence in the record." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 637.) "[A]s long as the City reasonably could have made a determination of consistency, the City's decision must be upheld, regardless of whether *we* would have made that determination in the first instance." (*Id.* at p. 638.) Generally speaking, the determination that a project is consistent with a city's general plan will be reversed only if the evidence was such that no reasonable person could have reached the same

11.

conclusion. (*San Franciscans*, *supra*, 102 Cal.App.4th at p. 677; accord, *San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 26 (*San Diego Citizenry Group*).)

### B. NPP Policies

Appellant first of all asserts that the project violates the NPP policies of the General Plan. The NPP policy provision at issue relates to the need for local shopping centers in the neighborhoods to which the NPP applies, and provides as follows: "A 7-9 acre neighborhood shopping center, containing 60,000 to 100,000 square feet of gross leasable space, should be located in each neighborhood." The same policy provision states that the shopping center "should be located at the intersection of two Arterial streets, as shown in Figure III-2."

We begin our consideration of this issue by noting how the City interpreted this General Plan policy in the proceedings below. The position taken by the City planning staff throughout the project review process, which was expressly adopted by the City in its findings approving the project, was that the project was consistent with the General Plan, including the NPP policies. The City concluded the project was consistent with the NPP policies because the project (1) provided for a neighborhood shopping center and (2) was properly located at an intersection of arterial streets. Further, while it was acknowledged that the project was larger than the neighborhood shopping center described in the NPP policies, the City understood that the depictions set forth therein were meant to provide guidance in the orderly development of neighborhoods, but were not mandatory limitations on the size of shopping centers. In support of this flexible interpretation, it was noted by staff in the proceedings before the Planning Commission and the city council that several other shopping centers had been approved by the City that exceeded the NPP policy's acreage and square footage descriptions. As one staff report states: "It should be noted that since these policies were adopted, the City has approved eight neighborhood shopping centers that exceeded the size called for in this

12.

policy, and in each case the City found the project consistent with the General Plan." It was also noted by staff that for many years the market trend in grocery stores has been for higher square footage, which was represented by the developer to be more economically viable.

In the instant appeal, appellant disagrees with the City's flexible interpretation and takes the position that all of the policies and descriptions set forth in the NPP should be treated as mandatory development standards. Appellant emphasizes that the project at hand is double the acreage amount and 70,000 square feet above the total leasable space contemplated in the NPP. Further, appellant points out that the City did not update the wording of the NPP in either 1995 or 2008, the two most recent occasions on which the City updated its General Plan and, therefore, any attempt to dismiss the NPP as being an outmoded relic in need of updating does not comport with the City's conspicuous failure to revise it. Additionally, appellant argues the City's position that shopping center developments larger than what is depicted in the NPP have routinely been approved by the City is flawed, because not all of the referenced shopping centers were in areas covered by the NPP policies. Finally, appellant argues that if the policies in the NPP were simply flexible goals to guide development, there would be no need for paragraph (f) of the NPP policies, which provides for minor adjustments to accommodate existing development in an area.

The City and real party (together respondents) have filed a joint respondents' brief in the instant appeal. Respondents insist that the NPP policy's enumerations of acreage and leasable square footage when describing a prototypical neighborhood shopping center were not meant as rigid development mandates, but rather were flexible descriptions to provide a basic model or pattern to guide the future development of the applicable neighborhoods.[4] Respondents argue that the project, although bigger than the

_____

[4] We note that the subject NPP policy, which states that a "7-9 acre neighborhood shopping center" containing "60,000 to 100,000 square feet of gross leasable space" should be

13.

shopping center depicted in the NPP, was essentially compatible with its main goals of providing a needed neighborhood shopping center at the intersection of two arterial streets.

In support of their position, respondents rely on the plain language of the NPP policies as well as the City's history or past practice of flexibly interpreting the NPP policies. As to the NPP's wording, the terms "prototype" and "model" are used in the NPP to describe its overall purpose, which reasonably suggests that the policies stated therein were intended to provide a guiding pattern or a model for future development of applicable neighborhoods. Indeed, the NPP expressly states that it is "a model for: subdivision designs, location of parks and other capital facilities, and zoning and pre-zoning studies," and a "'blueprint' for development of future residential neighborhoods." Further, the NPP states that it was "designed to create residential areas served by neighborhood parks, elementary schools, a neighborhood shopping center, and a collector street pattern connecting these uses." As the City planning staff put it in the proceedings below, "the policies were developed with the intent to provide guidance on how to arrange or lay out land uses in a neighborhood." Additionally, the use of the word "should" in the vast majority of the NPP policies, including the policy at issue in this appeal, while the mandatory term "shall" was used in one instance not applicable to this case, provides a reasonable basis for the more flexible construction of the acreage and square footage provision, as urged by respondents.[5] Based on the foregoing observations, we conclude that the wording of the NPP is reasonably consistent with the interpretation given to it by the City. Of course, we are required to accord "great

located in "each neighborhood" is not overtly phrased in terms of a mandatory cap or limitation. Thus, it may simply be *a descriptive estimate* of the usual or typical size of such a shopping center. Such a possibility fits the more flexible approach adopted by the City, with the City presumably having discretion to approve bigger or smaller centers when deemed advisable.

[5]     Paragraph (g) of the NPP policies states a mandatory requirement: "If the expressway is a Class A expressway, there shall be no Collector streets intersecting with the expressway." Virtually all of the remaining policy statements use the word "should."

14.

deference" to the City's interpretation of its own General Plan. (*Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 142.)[6]

Appellant replies that the "[m]inor adjustments" clause in paragraph (f) of the NPP policies indicates strict compliance should be required as to all policy terms, including the size descriptions for neighborhood shopping centers. We think appellant reads too much into that provision, which states in full that "Minor adjustments to the [NPP] can be made to accommodate existing development in an area." The provision is narrowly focused on what to do about *existing development* in an area. On that issue, it simply allows the City to work around existing uses or conditions on the ground; that is, it may make minor adjustments to accommodate for the same. Contrary to appellant's suggestion, the provision does not address the broader concern of whether to make all other NPP policies mandatory and binding limitations.

In addition to the plain wording of the NPP policies, respondents assert that "[t]he City's past practices also demonstrate the City's consistent construction of the NPP Policies as providing guidance to inform development, not inflexible mandates … [since] [t]here are multiple examples of the City's approval of shopping center projects that exceed the prototype in either acreage, square footage, or both." Respondents appear to be correct on this point. The two previous entitlements approved at the project site in 1981 and 1987 went substantially beyond the total acreage described in the prototype, each seeking to utilize 12 gross acres. The Lakes shopping center is located in an area covered by the NPP policies, and it exceeded the square footage parameters by 4,000 square feet. Other examples identified by respondents and mentioned in the record include the Standiford Square shopping center (at 10.22 acres and 112,579 sq. ft.), the

---

[6]     We are not suggesting that the framing of the NPP in terms of policies and goals (i.e., using the word "should"), rather than as rigid mandates, renders them merely advisory in nature. The test of compatibility still applies. (*Napa Citizens*, *supra*, 91 Cal.App.4th at p. 378.) Nevertheless, in deciding on the question of compatibility, we believe the nature and flexibility of the policy under consideration are important factors.

15.

Dry Creek Meadows shopping center (at 11.25 acres and 112,146 sq. ft.), and Wood Colony Plaza (at 13.76 acres and 171,171 sq. ft.), the latter being larger than the project in total square footage.[7]

Appellant counters that at least two of the prior shopping center developments referenced by the City staff in the proceedings below (i.e., the Crossroads shopping center and Village Center) were not subject to the NPP policies. Respondents do not respond to appellant's objection as to Village Center, but argue that the NPP policies would have been applicable to the Crossroads shopping center because it was approved and constructed prior to the City's establishment of the Redevelopment Planning District in that location. We think that uncertainty remains regarding these two challenged examples. Nevertheless, this discrepancy noted by appellant only relates to a part of the overall record and is insufficient to undo the remainder of the evidence on this point. Even if the disputed examples are not counted, there is still sufficient substantial evidence in the record to confirm respondents' position that there has been a consistent practice to treat the acreage and square footage description in the NPP policy as a flexible guide to neighborhood development, rather than a strict limitation on the size of shopping centers.[8]

As we summarized above, general plan consistency may be found where a project is compatible with, and does not frustrate, the general plan's goals and policies. (*Napa Citizens*, *supra*, 91 Cal.App.4th at p. 378.) In deciding that question, we are required to accord great deference to an agency's determination that a project is consistent with its

---

[7]    In addition, respondents assert two further examples of approvals of shopping centers where the NPP policies were allegedly in effect, but the acreage and square footage numbers of the NPP were exceeded (i.e., Obrien's Marketplace and the Crossroads shopping center).

[8]    We note that in the trial court, respondents distilled from the administrative record the "eight other shopping centers subject to NPP policies" that exceeded the acreage and square footage numbers stated in the NPP policy at issue. The eight were then summarized in a diagram that was attached to the trial court's ruling on petition for writ of mandate.

own general plan. (*Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 142.) That is because "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity." (*Ibid.*) Furthermore, "[b]ecause policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." (*Ibid.*)

In applying our deferential review, we decide whether the City's finding of consistency with the General Plan was "reasonable based on the evidence in the record." (*California Native Plant Society v. City of Rancho Cordova*, *supra*, 172 Cal.App.4th at p. 637.) "[A]s long as the City reasonably could have made a determination of consistency, the City's decision must be upheld, regardless of whether *we* would have made that determination in the first instance." (*Id.* at p. 638.) "An agency's finding that a project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion." (*San Diego Citizenry Group*, *supra*, 219 Cal.App.4th at p. 26.)

We find no abuse of discretion in the City's determination that the project was consistent with its General Plan, including the NPP policies. First, aside from the increased size of the shopping center over the prototypical size, the project fits and is compatible with NPP polices by placing a neighborhood-serving shopping center at the corner of an intersection served by two arterial streets, exactly as depicted on the NPP map, and complying with all other relevant policies. Second, the City's approval of a larger shopping center does not violate the General Plan because the NPP acreage and square footage descriptions were reasonably construed by the City as flexible guides to development, not rigid development limitations. That construction was reasonable based on the language of the NPP policies as well as the City's own past practices in applying

the NPP provisions.  For all of these reasons, we uphold the City's determination that the project was consistent with the NPP policies of the General Plan.

### C.        Rezoning Polices

Appellant contends the City failed to proceed in a manner required by law because, allegedly, it failed to make mandatory findings required by the General Plan's rezoning policy.  (See *Woodland Hills Residents Assn., Inc. v. City Council* (1975) 44 Cal.App.3d 825, 837–838 [reversal of approval of subdivision map required where governing body failed to make legally mandated finding of consistency with general plan].)  Respondents argue that all of the necessary findings were adequately made in connection with the several concurrent approvals on the project.  On balance, we agree with respondents.

The General Plan's "Community Development Policies" contain a policy governing zoning changes (the rezoning policy), which requires the City to make certain findings when it approves a zoning change.  The rezoning policy of the General Plan states, in relevant part, as follows:

> "Zone changes may be approved anywhere in the General Plan Area, if the following findings are made:

> "(1)     The requested zone change is required by public convenience or necessity.

> "(2)     The requested change will result in an orderly planning use of land resources.

> "(3)     The requested zone change is in accordance with the community's objectives set forth in:  '[NPP]' policies presented in Section C-2, below (for property within the Baseline Developed Area); or a Specific Plan prepared in accordance with this chapter (for property within the Planned Urbanizing Area); or the Redevelopment Plan (for property within the Redevelopment Area).

> "(4)     Adequate environmental mitigation has been provided through the implementation of appropriate mitigation measures established

18.

by the [MEIR] and any supplements to the MEIR.  Traffic and public facility issues are particularly relevant in this analysis."

The City made several approvals relevant to the project, each with an array of detailed findings, including (1) resolution No. 2014-16 (approval of FEIR and mitigation measures and adoption of a mitigation monitoring and reporting program or MMRP, etc.), (2) approval of ordinance No. 3597-C.S. (zoning changes enacted), and (3) resolution No. 2014-17 (approval of amendment to General Plan and adoption of findings of General Plan consistency).  As pointed out by respondents, the City's findings specified in connection with its approval of ordinance No. 3597-C.S. clearly satisfied the first three of the four findings required by the rezoning policy.  The same three concerns are covered to a further extent in the City's findings made concerning its approval of resolution No. 2014-17.  This leaves only the fourth of the necessary findings under the rezoning policy, which requires a finding of "[a]dequate environmental mitigation … through the implementation of appropriate mitigation measures .…"

We agree with respondents that the fourth and final finding under the rezoning policy of "[a]dequate environmental mitigation" was satisfied by the City's particular findings made in connection with approval of resolution No. 2014-16.  In a series of recitals, resolution No. 2014-16 first summarized the history of environmental review of the project, including the City's initial study that analyzed the project in relation to the MEIR, the City's decision to prepare a project-level EIR after certain concerns relating to traffic and urban decay (among others) were raised, the preparation of the DEIR, RDEIR, and FEIR regarding the project, and the fact that environmental impacts, mitigation measures and alternatives were analyzed therein.  Resolution No. 2014-16 then adopted the FEIR's findings, analysis and conclusions as the City's own, made certain CEQA findings including necessary findings relating to mitigation measures, adopted a mitigation monitoring and reporting program (MMRP), and made further, more detailed findings in an attachment that included a statement of overriding consideration.  The

19.

MMRP contained mitigation measures derived from both the MEIR and from the project-level FEIR  and, therefore, it appears to have included appropriate mitigation measures established by the MEIR and by "any supplements to the MEIR."  In addition, it is clear from the administrative record that the City staff and the Planning Commission, in recommending approval of the project, indicated that the adoption of feasible mitigation measures under the project EIR (including the MMRP) provided the requisite "[a]dequate environmental mitigation" for purposes of the rezoning policy.  Therefore, it appears that the findings in resolution No. 2014-16 were intended to satisfy the environmental adequacy finding under the rezoning policy.  On balance, we conclude that the necessary findings under the rezoning policy were made by the City.[9]

In the second prong of its claim that the City failed to make findings sufficient to comply with the rezoning policy of the General Plan, appellant argues that even if findings were made, they were noncompliant on their face because the findings required by the rezoning policy as to environmental mitigation included a substantive component that "[*a*]*dequate* environmental mitigation" has been provided "through … appropriate mitigation measures."  (Italics added.)  Appellant argues that the word "adequate" should be construed to mean that all significant environmental impacts—such as traffic impacts—be mitigated to less than significant levels.  Since the project entails certain traffic impacts that were found to be significant but mitigation was deemed to be

---

[9]     The City could have been clearer by more closely tracking its findings with the precise terms of the rezoning policy, and by including all four of the necessary findings together within the City's rezoning approval.  It should not have been necessary to locate any of the required findings among the other, concurrently adopted findings of the City.  Nevertheless, since adequate findings were *in fact* made, we will affirm rather than elevate form over substance.  To the extent that appellant is complaining that a fuller or more conspicuous elaboration of the MEIR's mitigation measures might have been made in the project EIR (or in the MMRP), appellant has failed to demonstrate error by showing that a material omission of any applicable mitigation measure occurred and, in any event, failed to raise that particular point below.

20.

infeasible, appellants argue the rezoning policy's mandatory findings requirement (of adequate environmental mitigation) was violated in this substantive sense.

We reject this line of argument because, among other things,[10] appellant's proffered interpretation of adequate mitigation is not reasonable in light of other policies in the General Plan. Goal No. 6.f. of the General Plan provides that the "highest possible levels of service for all transportation modes" be maintained on the City roadways, but only as "consistent with the financial resources reasonably available to the City and without unreasonably burdening property owners or developers with excessive roadway improvement costs." Similarly, goal No. 7.b. of the General Plan provides: "The City may allow individual locations to fall below the City's LOS [level of service] standards in instances where the construction of physical improvements would be infeasible, be prohibitively expensive, significantly impact adjacent properties or the environment, significantly impact non-motorized transportation systems, or have a significant adverse effect on the character of the community." When the rezoning policy is construed in light of these other provisions of the General Plan, the meaning of what is adequate mitigation under the circumstances must make allowances for the fact that mitigation is not required where it is infeasible. Therefore, appellant has failed to demonstrate that the City erred by simply adopting findings that did not require infeasible mitigation.[11]

### D. Other General Plan Policies

Additionally, appellant contends the approval of the project was inconsistent with, or failed to adequately comply with, two more General Plan provisions or policies— namely, goals Nos. 6.f. and 7.e. Respondents object that since these specific contentions

---

**10** For the reasons stated in the discussion above, we believe the findings adequately met the substance of the rezoning policy's finding requirements.

**11** Whether the findings of infeasibility were supported by substantial evidence is considered in our discussion regarding CEQA compliance. Here, we address only whether the City complied with the rezoning policy's finding requirements.

21.

were not raised in the administrative proceedings below, they may not be raised in the present appeal.  In light of the necessity of exhaustion of remedies, respondents are correct.

Under the exhaustion doctrine, regardless of whether the legal issues stem from CEQA or a failure to comply with a general plan, a party may not litigate issues in court that were not fully and fairly presented to the agency before it rendered the challenged decision.  (Pub. Resources Code, § 21177, subd. (a); Gov. Code, § 65009, subd. (b)(1); *California Native Plant Society v. City of Rancho Cordova*, *supra*, 172 Cal.App.4th at pp. 615–616.)  The rationale for the exhaustion doctrine is that the agency is entitled to learn the contentions of interested parties before litigation is instituted.  (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535.)  "The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review."  (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198.)  To advance the exhaustion doctrine's purpose, the exact issue must have been presented to the administrative agency.  (*Sierra Club v. City of Orange*, *supra*, at p. 535.)  General environmental comments, generalized references, or isolated or unelaborated comments will not suffice.  (*Id*. at p. 536.)  The objections must be "'sufficiently specific so that the agency has the opportunity to evaluate and respond to them.'"  (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 909.)  The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level.  (*Ibid*.)  The exhaustion of remedies requirement is jurisdictional.  (*Sierra Club v. City of Orange*, *supra*, at p. 535.)

There is no indication in the record that appellant, or any other person, presented the specific contention in the administrative proceedings below that the project's

approval was incompatible with goals Nos. 6.f. and 7.e. of the General Plan.[12]  Therefore, under the exhaustion doctrine, these issues were not preserved for purposes of the instant judicial challenge and will not be considered.

## II.    Compliance with CEQA

Appellant contends the City failed to comply with CEQA in several respects, including that (1) the findings of infeasibility as to certain mitigation measures were not supported by substantial evidence, (2) the urban decay findings were not supported by substantial evidence, and (3) the findings made in connection with the statement of overriding considerations were not supported by substantial evidence.  We now consider such claims, beginning our discussion with a summary of the standard of review for CEQA issues.

### A.    CEQA Standard of Review

Our review under CEQA is de novo in the sense that we review the agency's actions as opposed to the trial court's decision.  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).)  However, our inquiry extends only to whether there was a prejudicial abuse of discretion.  (§ 21168.5.)  "Such an abuse is established [(1)] 'if the agency has not proceeded in a

---

[12]    Goal No. 6.f. states:  "The highest possible levels of service for all transportation modes (vehicle, transit, pedestrian, and bicycle) shall be maintained on City roadways, consistent with the financial resources reasonably available to the City and without unreasonably burdening property owners or developers with excessive roadway improvement costs.  On roadways where the LOS is expected to exceed LOS F, the City should consider mitigation measures other than road widening, such as the addition of bicycle lanes, improved pedestrian access, improved transit service, and the establishment of walkable development patterns.  Data from the General Plan Traffic Analysis, described in the Traffic Appendix of the [MEIR], as updated from time-to-time, shall be used to evaluate the effectiveness of traffic mitigation measures adopted by the City Council."

Goal No. 7.e. states, in relevant part, that where an EIR is prepared for projects that could cause further traffic degradation below certain levels, the preparation of a comprehensive traffic study "shall include appropriate measures to update the General Plan Traffic Analysis for all subsequent Specific Plans, and for development within the affected Baseline Developed Area and Redevelopment Area, and shall conform to the Traffic Study Guidelines."

23.

manner required by law or [(2)] if the determination or decision is not supported by substantial evidence.'" (*Vineyard*, *supra*, at p. 426; see § 21168.5.) The nature of our judicial review of these two types of error "differs significantly." (*Vineyard*, *supra*, at p. 435.) We determine de novo whether the agency has employed the correct procedures, "'scrupulously enforce[ing] all legislatively mandated CEQA requirements,'" but we apply the more deferential substantial evidence test to the agency's substantive factual conclusions. (*Ibid.*)

As here, legal challenges under CEQA often relate to the adequacy of the information or analysis in the EIR. The EIR is "'the heart of CEQA'" and the primary mechanism to alert local agencies and the public to environmental impacts of proposed projects. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d. 376, 392 (*Laurel Heights*).) A public agency must prepare an EIR for any project that may have a significant impact on the environment. (§ 21100, subd. (a).). Among other things, the EIR must describe the proposed project and its environmental setting, identify and analyze the significant effects on the environment, state how those environmental impacts can be mitigated or avoided, and identify and discuss alternatives to the project. (Pub. Resources Code, §§ 21100, subd. (b), 21002.1, subd. (a); Guidelines, § 15126; *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 979 (*California Native Plant Society*).)

CEQA "requires an EIR to reflect a good faith effort at full disclosure"; however, "it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26 (*Dry Creek*).) The courts have looked "not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.) In reviewing an agency's determination to approve an EIR, "The court does not pass on the correctness of an EIR's environmental conclusions, but determines whether the EIR is sufficient as an informational document." (*Dry Creek*, *supra*, at p. 26; see § 21168.5; *Laurel Heights*,

24.

*supra*, 47 Cal.3d at pp. 392, 407.) "An adequate EIR must be 'prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. (Guidelines, § 15151.) It 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.]" (*Dry Creek*, *supra*, at p. 26.)

In challenges that are predominantly a dispute over the factual findings and conclusions reached in an EIR, "[t]he court must uphold an EIR if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA." (*Dry Creek*, *supra*, 70 Cal.App.4th at p. 26; see *Laurel Heights*, *supra*, 47 Cal.3d at p. 392.) For example, CEQA challenges concerning the amount or type of information contained in the EIR, the scope of the analysis, the choice of methodology or the reliability of data are all factual determinations reviewed for substantial evidence. (*Madera Oversight Coalition, Inc. v. City of Madera* (2011) 199 Cal.App.4th 48, 101 (*Madera Oversight Coalition*); *Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1546; *California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 986.) Likewise, in a factual dispute over "'whether adverse effects have been mitigated or could be better mitigated' [citation], the agency's conclusion would be reviewed only for substantial evidence." (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

Frequently, disputes center on the question of whether relevant information was omitted from an EIR. (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391 (*Association of Irritated Residents*).) Because a fundamental purpose of an EIR is to provide public agencies and the public with detailed information about the effect that a project is likely to have on the environment, the absence of information in an EIR may potentially constitute a failure to proceed in a manner required by law. (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco*

25.

(2014) 227 Cal.App.4th 1036, 1046 (*Citizens for a Sustainable Treasure Island*).) However, "The absence of information in an EIR does not per se constitute a prejudicial abuse of discretion. (§ 21005.) A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*Dry Creek*, *supra*, 70 Cal.App.4th at p. 26; accord, *Citizens for a Sustainable Treasure Island*, *supra*, at p. 1046; *California Native Plant Society*, *supra*, 177 Cal.App.4th at pp. 986–987; *Association of Irritated Residents*, *supra*, at p. 1391.) When that level of insufficiency of the EIR as an informational document has occurred, the agency has not proceeded in a manner required by law and reversal is required. (*Vineyard*, *supra*, 40 Cal.4th at 435, citing *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236; *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1220 (*Bakersfield Citizens for Local Control*.)

As the above overview reflects, in evaluating an EIR for CEQA compliance, "a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard*, *supra*, 40 Cal.4th at p. 435.) In other words, "our choice of the proper standard of review depends upon identifying correctly whether the question concerning the adequacy of the EIR's disclosures … is a question of law or a question of fact." (*Madera Oversight Coalition*, *supra*, 199 Cal.App.4th at p. 101.) To summarize the nature of our inquiry in deciding the standard of review: "[T]he omission of required information constitutes a failure to proceed in the manner required by law where it precludes informed decisionmaking by the agency or informed participation by the public. [Citation.] We review such procedural violations de novo. [Citation.] By contrast, we review an agency's substantive factual or policy determinations for substantial evidence. [Citations.]" (*California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 987.)

Here, it appears that appellant is essentially claiming that the City's findings, which were adopted in the course of approving the EIR and in making related CEQA determinations, were not based on substantial evidence in the record. In applying the substantial evidence standard, the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 393.) Under this standard, we may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. Nor may we weigh conflicting evidence and determine who we think has the better argument. Courts do not have "the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." (*Ibid.*) Rather, "'The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision.' [Citation.] That deferential review standard flows from the fact that 'the agency has the discretion to resolve factual issues and to make policy decisions.' [Citation.]" (*California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 985.)

CEQA's Guidelines define substantial evidence as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)

### B. *Infeasibility Findings as to Certain Traffic Mitigation Measures*

According to appellant, the EIR is inadequate because the findings stated therein that certain mitigation measures were "infeasible" were not supported by substantial evidence in the administrative record. To put it differently, appellant asserts that there *were* feasible mitigation measures proposed that the City declined to impose without providing adequate explanation for that decision supported by substantial evidence. We

27.

begin our discussion of this issue with an overview of what CEQA requires concerning mitigation measures and findings of infeasibility.

### 1. The CEQA Mitigation Requirement

"The core of an EIR is the mitigation and alternatives sections." (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 564.) An EIR must describe "feasible [mitigation] measures which could minimize significant adverse impacts." (Guidelines, § 15126.4, subd. (a)(1).) "'Mitigation'" includes: "(a) Avoiding the impact altogether by not taking a certain action or parts of an action. [¶] (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. [¶] (c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment. [¶] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. [¶] (e) Compensating for the impact by replacing or providing substitute resources or environments." (Guidelines, § 15370.) "'Feasible'" means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1; Guidelines, § 15364.) "Whether a mitigation measure … is feasible 'involves a balancing of various "economic, environmental, social, and technological factors."'" (*Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 381, citing *City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417.)

In section 21002 of CEQA, the Legislature declared, "it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects .…" "Section 21002 has been described as a 'substantive mandate that public agencies refrain from approving projects for which there are feasible alternatives or mitigation measures.' (*Mountain Lion*

28.

*Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134 (*Mountain Lion*).) This substantive mandate 'is effectuated in section 21081.' (*Ibid.*)" (*Friends of Kings River v. County of Fresno* (2014) 232 Cal.App.4th 105, 120.)

"Under [section 21081], a decisionmaking agency is prohibited from approving a project for which significant environmental effects have been identified unless it makes specific findings about alternatives and mitigation measures. [Citations.] The requirement ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision. [Citations.]" (*Mountain Lion*, *supra*, 16 Cal.4th at p. 134; accord, *Friends of Kings River v. County of Fresno*, *supra*, 232 Cal.App.4th at p. 120.) One such specific finding provided under section 21081 is that one or more mitigation measures identified in the EIR are determined to be "infeasible" due to "[s]pecific economic, legal, social, technological, or other considerations." (§ 21081, subd. (a)(3).)

In summary, "[u]nder CEQA, 'a public agency is not required to favor environmental protection over other considerations, but it must disclose and carefully consider the environmental consequences of its actions, mitigate adverse environmental effects if feasible, explain the reasons for its actions, and afford the public and other affected agencies an opportunity to participate meaningfully in the environmental review process.' [Citation.] [¶] As relevant here, a project with significant environmental impacts may be approved only if the decisionmaking body finds (1) that identified mitigation measures and alternatives are infeasible and (2) that unavoidable impacts are acceptable because of overriding considerations. [Citations.]" (*California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 982, citing *Federation of Hillside & Canyon Assns. v. City of Los Angeles*, *supra*, 126 Cal.App.4th at p. 1198.)

### 2. *The Necessity of Infeasibility Findings*

As we have explained, where an EIR has identified significant environmental effects that have not been mitigated or avoided, the agency may not approve the project unless it makes findings that "[s]pecific economic, legal, social, technological, or other considerations … make *infeasible* the mitigation measures or alternatives identified in the [EIR]." (Pub. Resources Code, § 21081, subd. (a)(3), italics added; see Guidelines, § 15091, subd. (a)(3).) Such infeasibility findings "constitute the principal means chosen by the Legislature to enforce the state's declared policy 'that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects .…'" (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 350, quoting § 21002.) "'If the agency finds certain alternatives to be infeasible, its analysis must explain in meaningful detail the reasons and facts supporting that conclusion. The analysis must be sufficiently specific to permit informed decision-making and public participation, but the requirement should not be construed unreasonably to defeat projects easily.' [Citation.]" (*California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 982.) An agency's infeasibility findings must be supported by substantial evidence in the record. (Pub. Resources Code, § 21081.5; Guidelines, § 15091, subd. (b).)

### 3. *The City's Infeasibility Findings*

In its traffic analysis, the EIR identified a number of intersections or roadway segments surrounding the location of the project site that would be impacted by the project to a significant degree during peak traffic hours, and other intersections or segments that would have such peak hour impacts based on a cumulative impacts analysis. Each intersection or roadway segment was analyzed in light of LOS criteria, based on such factors as increased volume of traffic or delays during peak hour traffic congestion, with technical thresholds of significance utilized by the City to determine

30.

when an impact would be deemed to be significant. As to each such intersection or roadway segment for which a significant traffic impact was identified, potential mitigation measures were discussed in the EIR, such as installation of traffic signals, right turn lanes, adding lanes, implementing overlap phasing, lane restriping, real party's (or the project's) payment of fair share fees, or other options, depending on the particular location and traffic setting. In several instances, the proposed mitigation measures were adopted by the City, including use of fair share fee payments. In other instances, the City determined that proposed mitigation measures were infeasible for specified reasons.

To support its findings that certain mitigation measures were infeasible, a variety of supporting factors were set forth by the City. Which factor or factors were asserted in a particular instance depended on the respective intersection or segment involved and the nature of the mitigation measure being proposed. Among the several factors or grounds of infeasibility stated by the City were the following: (1) existing business establishments in some areas[13] weighed against acquiring additional right-of-way needed for certain road expansion measures; (2) one or more of the proposed measures would result in a conflict with General Plan standards[14] for circulation; (3) the project's contribution to traffic increases was too small to justify requiring it to build the entire improvement constituting the mitigation measure; (4) there were no identified funding sources for a proposed mitigation measure to be fully funded and successfully built when needed; and (5) another project was already required to build out one of the proposed

---

[13]     As noted by respondents, goal No. 7.b. of the General Plan allows the City to reject traffic improvements that will significantly impact adjacent properties, or that will have a significant adverse effect on the character of the community.

[14]     We note the Guidelines expressly state that, for purposes of an EIR's analysis of project alternatives, consistency with the general plan is a factor. (See Guidelines, § 15126.6, subd. (f)(1).) Due to the importance of compliance with a general plan's fundamental policy elements, we assume that such consistency is likewise a relevant consideration for purposes of considering the feasibility of mitigation measures. (See, e.g., *City of Del Mar v. City of San Diego*, *supra*, 133 Cal.App.3d at pp. 415–416.)

intersection improvements (i.e., a traffic signal). The foregoing circumstantial and contextual information, recited as supporting grounds of infeasibility, was provided in the administrative record to the City in the form of staff reports and attachments, and was reiterated in the EIR. Along with these factors, the City was also aware of, and took into consideration, the magnitude of the estimated expense of each proposed mitigation measure and the proportionate share of the traffic impact attributable to the project. The cost estimates were largely provided in the first instance by appellant's traffic expert, although the City's traffic staff also supplied some of the financial estimates. For our purposes, the important thing is the City had that data before it and considered it.

By and large, the above facts and circumstances are among the type of considerations that should appropriately go into an agency's assessment of whether a measure is feasible or not. (See Pub. Resources Code, § 21061.1; Guidelines, § 15364 ["'[f]easible'" means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors"].) At first glance, it appears there was substantial evidence in the record that potentially supported the infeasibility findings that were made by the City when it considered the proposed mitigation measures. Moreover, the City's findings in that regard are presumed correct and appellant has the burden of affirmatively demonstrating otherwise. "The decisions of the agency are given substantial deference and are presumed correct. The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497.)

Appellant falls short of meeting that burden, in part because of its unfocused briefing on this issue. Appellant's opening brief does not clearly identify the particular mitigation measure (or measures) claimed by appellant to have been erroneously deemed infeasible, nor does it recite the basis for the City's findings or adequately explain to this

32.

court why appellant believes the City's findings in that specific matter lacked the support of any substantial evidence in the record. (See *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656 [the appellant has burden to demonstrate error by presenting legal authority and factual analysis on each point made, supported by appropriate citation to the material facts in the record].) Instead, appellant's opening brief makes a generalized argument, asserting error in the abstract while only briefly alluding to particular segments or intersections and particular mitigation measures. In a complex matter such as this, we believe that appellant has not met its burden on appeal. "As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261,1266.) Further, merely incorporating by reference matters filed in the proceedings below (e.g., administrative letters of VRPA Technologies, appellant's traffic consultant) is not a substitute for adequately *briefing* the specific arguments. (*Keyes v. Bowen*, *supra*, at p. 656 ["The appellant may not simply incorporate by reference arguments made in papers filed in the trial court, rather than briefing them on appeal."].)

But even considering the merits of appellant's contentions, we are not persuaded that the City prejudicially abused its discretion in making its feasibility findings. The main thrust of appellant's argument is that the City should have found feasible certain of appellant's proposals that real party (or the project) be required to pay more impact fees (also called fair share fees) that would go toward the cost of improvements needed at several distinct intersections or segments of roadway as to which a significant traffic impact still remained. Appellant's position is apparently that, as a general principle, it is *always* feasible (as a mitigation method) to impose more monetary fees on a project, since the collection of any amount of additional funds will always constitute at least an incremental step in the direction of eventually having enough money to accomplish the

33.

needed improvements.  As explained below, we disagree with appellant's over-simplified approach to the extent that it amounts to a blanket rule that does not adequately account for other factors bearing on the issue of feasibility, including when fee-based mitigation is proposed.[15]  In any event, as will be seen in the discussion below, the City's findings of infeasibility concerning the proposals to impose additional fair share fees on the project were adequately based on relevant factors that were supported by evidence in the record.

Of course, fee-based mitigation plans may be approved by an agency as a viable method of achieving mitigation in some circumstances.  Under CEQA Guidelines, an EIR may determine that a project's contribution toward the cost of a proposed mitigation measure adequately mitigates the project's proportionate share of a particular cumulative impact:  "An EIR may determine that a project's contribution to a significant cumulative impact will be rendered less than cumulatively considerable [(i.e., not significant)] … if the project is required to implement *or fund* its fair share of a mitigation measure or measures designed to alleviate the cumulative impact."  (Guidelines, § 15130, subd. (a)(3), italics added.)  However, the same provision of the Guidelines further states that the lead agency "shall identify facts and analysis supporting its conclusion that the contribution will be rendered less than cumulatively considerable."  (*Ibid*.)  In other words, the EIR and the lead agency adopting it must be able to substantiate that the fee-based mitigation plan is reasonably likely *to actually accomplish* the means of effecting substantial mitigation (e.g., the completion of a proposed road improvement).

Consistent with this principle, courts addressing the issue have held that while some "'unavoidable uncertainties'" as to funding and implementation are generally allowed, "'"a commitment to pay fees without any evidence that mitigation will actually

---

[15]     We note that feasibility determinations properly involve a balancing of factors.  (*Citizens Opposing a Dangerous Environment v. County of Kern*, *supra*, 228 Cal.App.4th at p. 381.)  It is difficult to square appellant's blanket approach with this fact.

occur is inadequate." [Citations.]'" (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 938, quoting *City of Marina v. Board of Trustees of California State University*, *supra*, 39 Cal.4th at pp. 364–365.) There must be a plan, enforceable by the City, reasonably ensuring that sufficient traffic funding will actually be obtained and will accomplish the required mitigation. (*Tracy First v. City of Tracy*, *supra*, at p. 938.) In summary, a traffic impact fee may be found to be an appropriate form of mitigation only if it is "linked to a reasonable plan for mitigation" (*Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1122) and "sufficiently tied to the actual mitigation of the impacts of increased traffic" (*Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 141; accord, *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1189). As to the timing for completion of the improvement constituting the mitigation of traffic impacts, as long as there is a reasonable plan for actually realizing that mitigation feature, the plan may be deemed adequate under CEQA even if does not include a "time-specific schedule" for the accomplishment thereof. (*Save Our Peninsula*, *supra*, at p. 141). On the other hand, where the record supports a conclusion that the actual mitigation measure (e.g., a road or traffic improvement to be built through impact fees) could not be adequately funded and accomplished in a successful manner within a reasonable period of time, the measure may be deemed infeasible. (*Napa Citizens*, *supra*, 91 Cal.App.4th at p. 365; accord, *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 785.)

Here, the City's traffic planning does incorporate the use of fair share fees to facilitate mitigation, which included imposing such fees on the project itself. As explained in the DEIR: "The City has a Capital Improvement Program (CIP) for improvements on Oakdale Road from Floyd Avenue to Sylvan Avenue. The CIP project includes improvements to the Oakdale Road and Floyd Avenue intersection that would add a southbound dedicated right turn lane, thereby resulting in two southbound through lanes. In addition, Oakdale Road will be widened to install a third northbound through

35.

lane north of the Oakdale Road and Floyd Avenue intersection. The City CIP project improves the function of the intersection and partially mitigates the identified impact .…
[¶] This intersection improvement project will be implemented as part of the City's CIP program and *the proposed project will contribute its fair share to the completion of the Oakdale Road CIP Project through the payment of Capital Facility Fees* .…" (Italics added.) Payment of such fees was made a condition of approval of the project. The FEIR provided further detail on how this would be applied. In regard to mitigation measure No. 3.3.1 (at Oakdale Road and La Forge Drive; intersection No. 6), the MMRP section of the FEIR stated: "Consistent with the City's CIP program, [real party] will provide a fair share contribution to the delineation of a westbound right turn lane at the Oakdale Road at LaForce Drive Intersection." In regard to mitigation measure No. 3.3.3 (at Oakdale Road and Floyd Avenue; intersection No. 8), it was stated that "Consistent with the City's CIP program, [real party] will provide a fair share contribution to the installation of a southbound right turn lane at the Oakdale Road at Floyd Avenue Intersection and the installation of a third northbound through lane north of the intersection."

Appellant believes that more should have been required, and its opening brief makes passing reference to intersections Nos. 3, 4 and 6, and to road segment No. 3 (as so numbered in the EIR), as examples of where the City allegedly erred in finding infeasible appellant's proposals to seek to accomplish mitigation through imposition of additional impact fees. Again, although we believe the briefing is inadequate to meet appellant's burden, we will briefly comment on these four matters. As to road segment No. 3 (which is the segment of Oakdale Road between Mable Avenue and Sylvan Avenue), appellant proposed widening the northbound segment of Oakdale Road by an additional lane, and it estimated the cost of this improvement at $500,000. Since the project was expected to increase traffic by 5.4 percent at peak hours along this segment, appellant urged that the project (or real party) should be required to pay 5.4 percent of the

total cost of the improvement. The City rejected the proposal as infeasible based on several facts and circumstances. First, the unmitigated impact would only exist for an interim period because the improvement was already required to be constructed in association with the development of the nearby Tivoli project. Second, based on the small proportion of the project's impact (about 5.4 percent) relative to the overall cost of the improvement and the lack of an identified funding source that would be adequate to cover the remainder of the cost to complete the improvement in the short term, the City determined it was infeasible to expect to be able to successfully accomplish this improvement prior to its construction as part of the Tivoli project.

As to intersection No. 3 (Oakdale Road at Mable Avenue), which would operate at an unacceptable LOS F under cumulative conditions (during peak hours) even without the proposed project, the implementation of the project would contribute more than five percent to the service volume of an approach at peak hours and increase average intersection delay at that time of day. Actual mitigation to an acceptable LOS grade would require "delineation of eastbound and westbound right-turn lanes, addition of a second eastbound and westbound left-turn lane, addition of a fourth northbound and southbound through lane, addition of a second southbound left-turn lane, and right-turn overlap phases for the westbound and eastbound movements." The total cost was estimated at over $2 million, and appellant proposed that the project pay a $50,000 fair share fee towards the mitigation measures. The City rejected these extensive mitigation measures for several reasons, including that the lane additions/road expansions in that location would significantly exceed standards in the General Plan for collector street/principal arterial street intersections, which would result in General Plan inconsistency. Further, the addition of new lanes would also require the acquisition of additional right-of-way that would significantly impact existing development, which the record showed included a residence and veterinary hospital. Finally, the City observed that there was no identified funding source for the remainder of the costs involved for

37.

accomplishing the proposed mitigation measures. Apparently, the City did not see how implementing a CIP or similar plan at this particular site would be able to generate sufficient funding to successfully accomplish the needed mitigation, nor was it aware of any other funding sources. As noted, a commitment to pay fees without any evidence that mitigation will actually occur is inadequate. (*Tracy First v. City of Tracy*, *supra*, 177 Cal.App.4th at p. 938.) Appellant has not shown any facts to the contrary. Similar types of factors, such as General Plan inconsistency, the need to obtain right-of-way that would interfere with existing business, and the lack of adequate funding sources to actually accomplish the mitigation, were cited by the City in rejecting mitigation measures for intersections Nos. 4 and 6.

While the City's discussions of its grounds for finding infeasibility in the above instances were far from perfect, and arguably should have been more specific, we believe they were not fatally deficient as to the presentation of adequate factual grounds to support the ultimate findings. The City's analysis did explain in meaningful detail the reasons and facts supporting the infeasibility conclusions, and the analysis was sufficiently specific to permit informed decision-making and public participation. Further, the particular factors cited by the City did appear to be supported by evidence in the administrative record, typically in the form of staff reports and attachments, and appellant has failed to convincingly demonstrate otherwise. We conclude that this particular attack on the City's approval of the project falls short.

### C. *Evaluation of a Project Alternative*

Appellant challenges the analysis in the EIR of one of the project alternatives. Section 5.4.4 of the DEIR sets forth the evaluation comparing the project to the "Reduced Project Alternative" (alternative No. 4). Under the Reduced Project Alternative, a 12-acre shopping center development would be developed on the northern portion of the project site, and condominiums (66 units) and apartments (196 units) would be developed on the remaining six acres. The DEIR compared the various environmental effects of this

potential alternative with the project's anticipated effects, including with respect to aesthetics, air quality, biological resources, climate change, geology and soils, hazardous materials, hydrology and water quality, land use and urban decay, noise, public services and utilities, and traffic and circulation.

CEQA Guidelines provide that an EIR "shall describe a range of reasonable alternatives to the project …, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (Guidelines, § 15126.6, subd. (a).) As to the level of analysis required, the Guidelines state: "The EIR shall include sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison with the proposed project. A matrix displaying the major characteristics and significant environmental effects of each alternative may be used to summarize the comparison." (*Id.*, subd. (d).) Here, as indicated above, it is clear that the EIR complies with the applicable regulation.

The City reviewed the EIR's analysis and ultimately concluded in its findings that the Reduced Project Alternative would not adequately meet project objectives or be economically feasible. Therefore, the Reduced Project Alternative was rejected. The findings stated, among other things, that although the Reduced Project Alternative would slightly lessen some of the proposed project's significant impacts, it would not further respondents' objectives related to the scope and scale of the commercial component of the project because economic viability in the grocery store industry has necessitated an increasing size of grocery stores, with an increasing variety of goods and services offered. This, in turn, has led to increased shopping center sizes to maintain an economically viable ratio of grocery store to other retail space within the center. A further consideration affecting the viability of a smaller center at this location is the access restrictions that would result from application of the City's standards to the smaller site, which would result in only two driveway accesses to the smaller shopping

39.

center. In making these findings, the City found credible the information from respondents, which provided further detailed analysis relating to economic viability. Substantial evidence in the record supported these findings. Indeed, as was aptly stated by the trial court in its ruling below, "[t]here is a reasonable inference that if the Project were reduced to 12 acres it would suffer the same fate as the other proposed projects suffered in 1981 and 1987." Furthermore, consistent with CEQA (see § 21081), the City made findings in a statement of overriding considerations setting forth reasons for moving forward with the project despite there being some unmitigated impacts.

Based on what we have stated, it appears that the EIR and the City's findings with respect to the Reduced Project Alternative complied with CEQA. The description and evaluation of this alternative was adequate, and the City properly considered that information but ultimately rejected the alternative as infeasible as specified within its findings that were based on substantial evidence in the record.

Nevertheless, appellant suggests that under Guidelines section 15126.2, subdivision (b), the EIR was inadequate as an informational document in its discussion of the Reduced Project Alternative. Preliminarily, we would point out that Guidelines section 15126.2 addresses the matters that should be discussed in an EIR regarding significant environmental impacts. *Another* section of the Guidelines—section 15126.6—is the one that is primarily applicable to the discussion of relevant project alternatives. As we have noted above, the EIR fully complies with section 15126.6. Appellant has failed to adequately explain, with discussion of legal authority, why an EIR that is in compliance with the specific provision that is directly applicable to the analysis of alternatives should nevertheless be deemed inadequate in regard to that analysis in the present case.

Although not altogether clear, it would appear that appellant is attempting to seize upon an isolated sentence in Guidelines section 15126.2, subdivision (b). That provision, after stating that an EIR should "[d]escribe any significant impacts, including those

which can be mitigated but not reduced to a level of insignificance," further states that "[w]here there are impacts that cannot be alleviated without imposing an alternative design, their implications and the reasons why the project is being proposed, notwithstanding their effect, should be described." We note that the EIR *did* provide this type of descriptive information in its discussion of the project's significant environmental effects and potential mitigation, which subject areas would seem to be the probable context of the wording of Guidelines section 15126.2, subdivision (b), since it entails what should be considered *without* imposing an alternative design. Thus, appellant's line of argument appears to be misplaced. In any event, appellant's cursory mention of this issue fails to adequately demonstrate that the EIR is deficient under that provision, nor does appellant provide legal authority or cogent legal argument to support the provision's application to the EIR's discussion of the project alternative. Moreover, as already noted above, the EIR complies with the applicable Guidelines with respect to evaluation of alternatives. For all of these reasons, no prejudicial abuse of discretion on this issue has been demonstrated.

### D.    *Findings as to Urban Decay*

Appellant asserts that there was no substantial evidence in the record to support the EIR's findings that the project would have no significant urban decay impacts. We disagree with appellant's assertion, as we shall briefly explain.

While economic or social impacts of a project are not in themselves treated as significant environmental effects, CEQA is concerned with whether a project's economic or social impacts will cause adverse physical changes in the environment. (Guidelines, § 15131.) For example, the economic or social impacts of a project could foreseeably result in a downward spiral of store closures and long-term vacancies that create physical deterioration to an urban environment, an impact usually referred to in CEQA parlance as "urban decay." (*Bakersfield Citizens for Local Control*, *supra*, 124 Cal.App.4th at pp. 1204, 1212–1213 [EIR should have analyzed the potential urban decay impacts from

41.

two regional big box retailers situated in relatively close proximity in a saturated retail market].)

Here, the DEIR analysis contained a description of the market setting, both in a regional and local level, including indications of improving market conditions and declining vacancy rates (as the City emerged from the past real estate recession) and statistical evidence that when vacancies arise in the City, there is a history of successful backfilling (or re-tenanting) of such vacant commercial space with new commercial uses. Where vacancies presently exist, a visual scoping indicated the properties remain well maintained. The project is not a regional supercenter, but more of a traditional anchor grocery store, only somewhat larger. It meets different needs and draws from a more limited trade area than such regional supercenters. After considering the size of the project, the market conditions, the history of backfilling in the City, the flexibility for some commercial spaces being repurposed, and the City's consistent enforcement of property maintenance ordinances, it was determined that the project would not result in significant urban decay impacts. The City's analysis in the EIR was supported by substantial evidence in the record, including City staff reports and testimony, other expert testimony, and an economic report from Terranomics. The City's findings were further supported by evidence and testimony of real party, as an experienced commercial developer familiar with both the retail market setting and the physical condition of existing shopping centers in the area.

Appellant puts more weight or credibility on other evidence, would want to see more exhaustive data, and disagrees with the City's conclusion. On review, such arguments are beside the point. In applying the substantial evidence standard, the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 393.) Under this standard, we may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. Nor may we weigh conflicting evidence

42.

and determine who we think has the better argument. (*Ibid.*) Since there was substantial evidence in the record to support the City's urban decay findings, appellant's argument fails.

### E.     *Statement of Overriding Considerations*

Appellant's final CEQA attack on the City's approval of the project is that the City's findings regarding the benefits of the project in its statement of overriding considerations did not have the support of substantial evidence in the record. Again, we disagree with appellant's assessment.

An agency must adopt a statement of overriding considerations when it approves a project in spite of significant, unavoidable environmental impacts. (Pub. Resources Code, § 21081, subd. (b); Guidelines, § 15093.) The agency must find, with respect to significant effects of the project, which were unavoidable, that "specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (§ 21081, subd. (b).) "The statement [of overriding considerations] reflects the 'final stage' in the agency's decisionmaking process." (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 356 (*Cherry Valley*).) It is intended to show the balance the agency struck in weighing the benefits of a proposed project against its unavoidable environmental risks. (*Id.* at p. 357.) The findings must be supported by substantial evidence in the record. (Guidelines, § 15093, subd. (b).) "A lead agency's decision to approve a project despite its significant environmental impacts is a discretionary policy decision, entrusted to it by CEQA, and will be upheld as long as it is based on findings of overriding considerations that are supported by substantial evidence." (*Cherry Valley*, *supra*, at p. 357.)

In its statement of overriding considerations, the City made findings that the benefits of the project outweighed unavoidable impacts. The specific benefits of the project referred to by the City in its findings included (1) economic development and job

43.

creation; (2) creation of transportation and infrastructure improvements; (3) increase in tax revenues; and (4) the advancement of several General Plan policies.

In support of the finding that the project would spur economic development and job creation, there was substantial evidence in the record that the project was in an area of town currently underserved, in part because older grocery stores had relocated or closed and in part because the number of residents in the vicinity had significantly increased. Since there was a substantial market demand for the project within this area of town surrounded by residential neighborhoods that would be served by it, the City could reasonably infer that new jobs would be created.[16] The project would meet this demand and expand retail services in northeast Modesto, providing an opportunity for businesses to locate into modern and attractive commercial space. Based on the same factual basis, the City could also reasonably infer that once the anchor grocery store and other retail businesses were established at the project site, this increased development would expand the City's public revenues in terms of additional property and sales tax revenue.

On the issue of jobs and tax revenues, appellant maintains that a comprehensive market study had to be conducted to determine the precise number of jobs and tax dollars that would be generated, but it fails to cite any provisions of CEQA or the Guidelines for that proposition. In reality, CEQA only requires that the findings be supported by substantial evidence in the record. (Guidelines, § 15093, subd. (b).) Appellant also argues there is a potential risk that some jobs would simply represent workers coming from existing businesses that decided to relocate to the project's commercial shopping center. But even if that were true in the short run, the City has a history of successfully backfilling vacated stores with new tenants, as noted previously. We conclude there was

---

**16** The precise number of jobs was not specified. One business person estimated that if Save Mart became the anchor tenant, it would bring 100 to 120 jobs. Appellant's traffic consultant factored into its analysis 90 retail and service employees.

44.

substantial evidence in the record to support the City's findings that the project would indeed lead to job creation, economic growth and increased tax revenues.

Additionally, the project would plainly result in the construction of a number of needed and beneficial transportation improvements, including bus transit improvements. Infrastructure improvements to accommodate growth are a recognized benefit that can be relied upon in a statement of overriding considerations. (*Cherry Valley*, *supra*, 190 Cal.App.4th at p. 357.) The City's findings also cited certain General Plan policies that would be furthered. Although appellant characterizes the cited General Plan policies as too generalized to be a suitable consideration, it does not refute this factor. On balance, we conclude that the City's findings in support of its statement of overriding considerations were adequately supported by substantial evidence in the record. Although appellant disagrees with the City's final decision to balance the considerations involved in the way that it did, appellant has failed to show the City prejudicially abused its discretion.

## DISPOSITION

The trial court's denial of the petition for writ of mandate and the resulting judgment in favor of City is affirmed. Each party shall bear their own costs on appeal.

_____

KANE, J.

WE CONCUR:

_____

HILL, P.J.

_____

SMITH, J.

45.